OPINION OF THE COURT
John D. Bennett, J.
This proceeding involves gifts made by a father, now deceased, to his four children under the New York Uniform Gifts to Minors Act. This is only one of several cases involving that act now pending in this court, in all of which counsel have submitted memoranda and spent a great deal of time in research. Almost all appear to have missed the main point by applying the wrong principles of law, due probably to what some term a "paucity of cases” on the subject. Because of the doubts and uncertainties raised the court now deems it important to discuss the act generally before going into the merits of this particular proceeding and to alert the Bar that cases such as those cited in the instant matter involving strictly trust and fiduciary responsibilities are not applicable.
The inherent difficulty encountered is due to the failure of attorneys to recall the legislative purpose of this "uniform” act first adopted in New York 22 years ago (L 1956, ch 35, formerly Personal Property Law, art 8-A, now EPTL 7-4.1 to 7-4.9). New York was the 10th State to adopt what was originally known as a "model” act and then as a "uniform” act. The act was sponsored primarily to simplify the procedure in giving gifts to minors and to assure obtaining the annual gift tax exclusion of $3,000 (31 St John’s L Rev 155, 157).
The idea is said to have initiated in a speech made by the president of the New York Stock Exchange before the New York Association of Security Administrators on September 29, 1954. For this statement and an excellent review of the legislative history of the act in New York, giving "tax consequences, possible abuses and recommendations” the court refers the Bar to an excellent article by Professor Lawrence Newman published in 1963. (49 Cornell LQ 12; for an earlier, briefer review of the act’s purposes, see 25 Fordham L Rev 390-394.)
*584 It is clear that the custodian act created a brand new relationship as between the custodian on the one hand and the minor on the other. The act being primarily a device to save expense and procedural problems relies upon the family relationship and avoids too much formality. The act itself does not directly mention the legislative purpose and intent, so it is necessary to consult the earlier contemporary writings, particularly since the purpose has been so successfully achieved that it has not been necessary to resort to the courts except in rare cases.
A memorandum of the State Banking Department approving passage of the legislation (McKinney’s Session Laws of NY, 1956, p 1808) refers merely to the act as facilitating gifts to minors by transferring them to a custodian who may be the donor, any adult member of the family of the minor or any guardian. However, it did note that "the custodian is to have almost all of the rights of an owner, except that he must act as a prudent man. He is not bound by any rule limiting fiduciaries in holding, transferring and investing fiduciary funds. Third parties may deal with him as if he were the owner and are not bound to inquire * * * unless they have knowledge that he has committed a breach of his obligation, or * * * facts that * * * will amount to bad faith” (emphasis supplied).
When first adopted in New York as article 8-A of the Personal Property Law, the act did contain language indicating a possible trust relationship since it specified that the custodian "shall hold a power in trust” and in addition "all the rights, powers and duties * * * of a guardian of the property of an infant” with some exceptions there noted (former Personal Property Law, § 266, subd 1). This language has since been omitted and it is only a custodian who is compensated for his services (as a trust company or one who is also a guardian) that is today "subject to the same liabilities as a guardian of the estate of a minor” but the act adds "except as the custodian’s powers and duties under this part are different from those of such a guardian” (EPTL 7-4.4, subd ED.
The act must be carefully read in its entirety in order to understand it fully. It will be found that a custodian is not included in the statutory definitions of "fiduciary” either in SCPA 103 (subd 21) or in EPTL 11-1.1 (subd [a]). It appears that the custodian has almost all of the incidents of ownership *585 while the minor at all times has indefeasible legal title. The implications from this are many, but instead of engaging in a dissertation in this opinion, those interested are referred to the law reviews mentioned above. (See, also, Tenney, Gifts to Children — a New and Realistic Method, 2 Practical Lawyer, p 19 [Nov. 1956].)
The paucity of cases on the subject, as noted above, is itself a good indication that the purpose of the Gifts to Minors Act generally, and in New York particularly, has been fulfilled. The vast majority of children do not sue their parents or family members who are custodians. The very looseness and liberality of the intrafamily relationships encourage use of the custodial device but unfortunately when there is a family breakdown the court becomes involved. It may also be noted that, as to jurisdiction, since the custodial legislation is contained in the SCPA, any reference to "court” includes the Surrogate’s Court (SCPA 103, subd 10).
In the matter now before the court one of four children of the deceased donor father has petitioned this court to compel her mother, the successor custodian, to account for the proceeds of a gift of securities, originally made by the father to himself as custodian for petitioner. The mother did finally render an account with much litigation involved and the issues were ultimately heard before this court on four days, starting on September 28, 1977 and concluding on November 10, 1977. After almost 400 pages of minutes just on the hearing before the court (and there were many others on preliminary court examinations) a question arose even as to the cost of the transcript, so that the minutes were not filed with the court until almost a year later, on September 28, 1978. Numerous attorneys were involved on both sides and at this juncture the court is not informed as to the expense incurred for legal services, but it is confronted with that problem, to be decided later.
In general, it would appear that the mother had complied with the requirements of the statute by filing her account. The court finds that she personally spent, from her own funds, considerably more for the "benefit” of the petitioning daughter than the $22,500 which she had received as successor custodian. In this connection let it be emphasized that certain language of the act (EPTL 7-4.3, subd [b]) authorizes the custodian (and successor custodian) to pay directly "to the minor for expenditure by him, or expend for the minor’s *586 benefit, so much of or all the custodial property as the custodian [only] deems advisable for the support, maintenance, education and benefit of the minor in the manner, at the time and to the extent that the custodian in his [sole] discretion deems suitable and proper * * * with or without regard to the duty of himself or of any other person to support the minor or his ability to do so and with or without regard to any other income or property of the minor which may be applicable or available for any such purpose” (emphasis supplied). That section continues (emphasis supplied):
"(d) To the extent that the custodial property is not so expended, the custodian shall deliver or pay it over to the minor on his attaining the age of twenty-one years * * *
"(e) The custodian, notwithstanding statutes restricting investments by fiduciaries, shall invest and reinvest the custodial property as would a prudent man of discretion and intelligence who is seeking a reasonable income and the preservation of his capital * * *
"(f) The custodian may sell, exchange, convert or otherwise dispose of custodial property in the manner, at the time or times, for the price and upon such terms as he deems advisable * * *
"(g) The custodian shall * * * keep all other custodial property separate from his own property in such manner as to identify it clearly as custodial property.
"(h) The custodian shall keep records of all transactions with respect to the custodial property and make them available for inspection at reasonable intervals * * * by the minor, if he has attained the age of fourteen years.
"(i) The custodian has such powers with respect to the custodial property, in addition to the rights and powers provided in this part, which a guardian has with respect to property not held as custodial property.”
EPTL 7-4.4 provides, inter alia, that
"(b) The custodian, other than a trust company or a guardian of the property of a minor, shall receive no compensation for his services * * *
"(e) The custodian not compensated for his services is not liable for losses to the custodial property unless they result from his bad faith, intentional wrong doing or gross negligence or from his failure to maintain the standard of prudence in investing”. (Emphasis supplied.)
*587 EPTL 7-4.6 provides, inter alia: "(c) * * * The legal representative of a custodian who dies or becomes legally incapacitated shall promptly do all things within his power to put each item of the custodial property in the possession and control of the successor custodian”.
The statutory powers given to an unpaid successor custodian are thus found to be extremely broad and sweeping while the duties are limited and quite specific. There is nonetheless what appears to be a significant lack of any affirmative statutory penalty or even a guide expressed in the act directing the court should it find one or more "violations.” Any court, including this one, is reluctant to apply, with punitive stringency in mind, any sanctions or punishment against a parent "legally” using such broad discretion in the application of the child’s funds for the "benefit” of the latter.
In the case at bar, counsel have cited cases of fiduciary responsibility which, as noted above, do not apply. They have, moreover, restricted their arguments to the specific "facts” or lack thereof as shown on the record of these proceedings which do not disclose bad faith or intentional wrongdoing by the mother in the absence of which she would not be liable under EPTL 7-4.4 (subd [e]) for losses to the custodial property. However, facts and evidence which prima facie disclose her apparent bad faith have been documented under oath by the mother herself in her accounting proceeding as executrix in this court! As discussed below, such documentation cannot be overlooked and must be explained satisfactorily to this court in the interests of justice and to determine what equities should be applied to petitioner and the other three children in the accounting proceeding (SCPA 201, subd 3).
It was stipulated on the trial between counsel that the donor father Julian L. Robinson did establish with a stock brokerage firm four custodian accounts totaling $90,000 for the four children; that as custodian he instructed the broker to sell the securities and they were sold and the proceeds delivered after his death to the mother as executrix. The four checks issued were returned presumably by the executrix and thereafter four new checks were issued, each for $22,500, payable to the mother as successor custodian for each of the children. Counsel for the respondent stipulated that the four custodian accounts totaling $90,000, represented by four checks issued to the respondent were returned to the broker *588 and thereafter four "additional” checks were issued each for $22,500.
The respondent was called to testify concerning "what happened to the fund”. She testified that she sought advice from her late husband’s "best friend and business partner, also Godfather to my children” and upon Mr. Carter’s advice she "was to take the check and deposit it into a personal account that they [the attorneys] had opened for me. From that point on I was to issue a personal check into the estate of Julian Lasky Robinson for $90,000, which I did, and I was then to pay off estate bills as fast as I could”. She further testified that Mr. Carter’s secretary "drew upon my account for $90,000, deposited to the estate of Julian L. Robinson, $90,000, signed by me.” That check was numbered 149, dated September 13, 1972 and is marked as respondent’s Exhibit No. 1 in evidence. It cleared both banks on September 15, 1972.
The respondent testified that she had never been employed either prior to or after the death of her husband; that she discussed with her children the state of the family’s financial affairs after his death, told them what she had been advised to do and that she proposed to pay off the estate debts as quickly as possible in the following language: "Girls, we’re in big trouble; we have to pay off daddy’s debts to clear the estate. That’s what I’ve been told. You have funds and I have funds. Can we pool them?” And they said, "Yes, by all means. You can even have our savings accounts books. Anything we can do to help pay off daddy’s debts.” Her testimony substantially is that she had a similar conversation separately with her son at the hospital where he was being treated and that he too consented to this arrangement. As to the conversation with the three girls, she was corroborated by two of them but the petitioner and her brother denied that such conversation took place. There was thus raised a sharp issue of credibility.
Not disclosed in this proceeding but nevertheless sworn to by the respondent mother in her accounting as executrix of the father’s estate, she appears to have claimed personal ownership of the entire $90,000! Her said account was verified on December 6, 1977, 26 days after the last day of the hearing in this proceeding; it was verified before the same attorney, as notary public, who has represented her and argued her case herein. That account, filed December 9, 1977 in this court, does not list any of the four children as creditors of the father’s estate but does state in schedule D that respondent *589 personally made a loan on September 15, 1972 in the amount of $90,000. This appears, therefore, unless satisfactorily explained, to be a direct and judicial admission that , she claimed therein to be entitled to personal reimbursement for that $90,000, contrary to the rights or any title and ownership of the four children. The same schedule D lists other "loans” by her personally advanced, making a total of $171,599. Adding to that other "debts” and administration expenses increased her personal claims to $193,720 of which she stated that she had already received in partial repayments (presumably without any application to this court for permission) the sum of $85,885, thereby allegedly leaving a balance due to her personally from that estate the sum of $107,835.
All of her testimony herein and the arguments of her attorney have been predicated on the claim that the $90,000 was used by the mother to pay the father’s bills and that this was for the "benefit” of the minor children and with their consent and acquiescence. Nowhere did the mother or her attorney disclose in this proceeding that contrariwise, she was using it as a device for personal gain. Obviously her own good faith and intentions are now in question. Her testimony in 1977 and the present arguments of her counsel should be judged accordingly.
It is now argued on behalf of the respondent that these conversations amounted to legal authorization to her as successor custodian to use the custodial funds to pay off "daddy’s debts,” but no mention is made of her personal claim in the estate. The petitioner asserts that the infants had no right or authority to make such an "agreement,” that it was not binding upon them as infants and as such they cannot be estopped by their conduct or statements against their interests. If confronted by the necessity to determine that question without disclosure of her personal claim against the estate, the court might have found sufficient basis for the mother as successor custodian to exercise her own statutory discretion to decide that such use of the funds would be "for the benefit” of all four minors. The circumstances presented here would indicate a total absence of good faith of respondent.
It was noted earlier in this opinion that the mother rendered her account and did prove that she spent (although not as custodian) for the "benefit” and support or maintenance much more than $22,500 for this petitioner. This family, it appears, was accustomed, before and after the father’s death, *590 to a high standard of living. After the father’s death the mother continued his practice and paid all of the bills for evening dresses, jewelry, cosmetics, cigarettes; she also paid for the petitioner’s wedding and, while disputed, there is an indication that the respondent even assisted the petitioner’s husband through a letter of credit to follow some kind of business pursuits. These were all done by the mother respondent, however, in her own name and from her own funds after she paid the children’s $90,000 to the estate. She might instead have paid the petitioner’s bills and kept the records as coming directly from the custodial funds. This she did not do but instead actually deposited the custodial funds in her own personal bank account with the Chase Manhattan Bank National Association at 410 Park Avenue, New York, said account allegedly having been opened for her by Mr. Carter’s attorneys.
Some of the other checks were signed "Patricia B. Robinson by Janet McDonald, Att.” and appear to have been in the same handwriting as Exhibit No. 1 which was signed by the respondent herself. These observations are made because there was no testimony here by Janet McDonald, by Mr. Carter, or by his attorneys and the court does not recall any evidence or testimony to corroborate that the respondent’s personal account in the Chase Manhattan Bank had been opened for her by Mr. Carter’s attorneys, or what purpose was to be served thereby in view of the existence of the other accounts.
In the early portion of the trial petitioner moved for summary judgment which her counsel stated "potentially could be dispositive of the entire issue right now * * * that the monies were in fact taken by her [respondent] and placed into an account to pay off the debts of her deceased husband and not in fact used for the benefit of the children.” In response the mother’s counsel urged, "If the Respondent-Custodian is going to be guilty of anything she might be guilty of comingling, but whether or not the Petitioner can show damage is something else.” Later, the court stated that summary judgment is a "pretty drastic remedy. I will reserve decision and take care of it in my decision.”
The foregoing brief argument pointedly illustrates one of the problems or weaknesses, as it were, in the custodial act. Nowhere is there any prescribed penalty or reference to "damages” sustained by a minor. Commingling is definitely *591 prohibited but there is serious doubt whether any court, of equity or law, would impose sanctions or any kind of penalty upon a custodian or successor custodian unless there is demonstrated bad faith, willful wrongdoing or gross negligence. The act requires records to be kept but what parent would keep detailed records before an issue is raised and even then they can be assembled or reconstructed to show a picture of fair and honest dealing. The proof in this case is quite detailed and, as previously noted, might have satisfied the court that this respondent had accounted for expenditures which she made for the "benefit” of the petitioner. As clearly stated in the act, any expenditures can be made "with or without regard to the obligation of the custodian or any other person to 'support’ the minor.” The sole judge under the act as to what expenditure is for the "benefit” of the minor is the person at the time having custodial powers, in this case the respondent mother only. Inferentially even the court’s own judgment could not be substituted for that of the custodian.
Even commingling could be excused by a court of equity in a proper setting. In the setting here disclosed the mother’s "commingling” might have been excused if in good faith and well intentioned especially since, as noted above, the court is bound to carefully consider the family circumstances and way of life to which the interested parties have been accustomed and dealt with each other. Where a parent is custodian, he (or she) is given sole discretion by the act as to what will "benefit” the child.
In this case the mother argues, without disclosing her acts as executrix, that she properly exercised her discretion for the four children as custodian, supposedly to pay the decedent’s debts. In its deliberations the court therefore must now carefully consider the impact of any determination that might be made here on all four children. Normally the decision of the court would have to be predicated only upon the evidence adduced in the current proceeding but it now refers to the other proceedings in order to exercise the mandate upon it in SCPA 201 (subd 3) to "determine all questions, legal or equitable, arising between any or all of the parties to any action or proceeding, or between any party or any other person having any claim or interest therein, over whom jurisdiction has been obtained as to any and all matters necessary to be determined in order to make a full, equitable and complete disposition of the matter * * * as justice requires.”
*592 The court anticipates that any other intervening rights and equities should be considered, including those of children who, although witnesses, were not made parties to this proceeding. Accordingly, the following directions are made:
This proceeding is hereby consolidated with the accounting proceeding by Patricia B. Levy as executrix of the estate of Julian L. Robinson, file No. 157962.
Counsel for the petitioner is also hereby directed to prepare and submit for signature by the court an appropriate order to be served upon all parties or their attorneys interested in both proceedings, directing them to show cause on a date to be fixed therein, why a further hearing should not be had before this court to introduce whatever facts and circumstances should be considered before determining what judgment or relief should be rendered as between and among the mother individually, as executrix and as successor custodian under the uniform act, the four children, the special administrator c.t.a. and any other parties.