**Ellen MARSHALL, individually, and as mother and natural guardian of Sabrina Marshall and Grant Marshall, infants under the age of 14 years, Plaintiffs,**

v.

**UNITED STATES of America, Defendant,**

and

**The Bank of New York, Stakeholder.**

No. CV 91–3557 (MLO).

United States District Court, E.D. New York.

June 14, 1993.

John Marshall, Plainview, NY, for plaintiffs.

Andrew D. Plepler, Keith Morgan, Dept. of Justice, Tax Div., for Government.

Jean Shedlock, Bank of New York, for Stakeholder.

## AMENDED MEMORANDUM AND ORDER

ORENSTEIN, United States Magistrate Judge.

Plaintiffs seek a judgment declaring that: (1) plaintiff, Ellen Marshall, is the custodian of these accounts; (2) the United States has no legal interest in these accounts; and (3) The Bank of New York has no legal duty to pay to the Government the monies held in these accounts. In addition, plaintiffs seek to enjoin the United States of America (the "Government") from enforcing its levy against certain of plaintiffs' bank accounts and certificates of deposit (the "accounts") at The Bank of New York.

## INTRODUCTION

Plaintiffs allege that the bank accounts at issue are custodial accounts under the Uniform Gifts to Minors Act ("UGMA") of New York and thus are not subject to the Government's Notice of Levy which was issued on August 23, 1991 to collect 1982, 1983 and 1984 joint federal income tax liabilities of plaintiff's husband and Ellen Marshall. The tax liens stem from certain tax liabilities of the Marshalls which accrued due to the disallowance of certain deductions from a "tax shelter." Plaintiffs contend that the money in the UGMA accounts is the property of Sabrina Marshall and Grant Marshall, the children of Ellen Marshall, and the grandchildren of the donor, SelmaLee Kaufman. Plaintiffs contend that the money in the accounts are gifts from the children's grandmother. The UGMA custodial accounts levied upon were opened on January 17, 1989 for Grant and on March 22, 1989 for Sabrina at the Bank of New York. *Gov't Ex.* R and Q.

Plaintiffs also seek to recover costs and counsel fees against the Government pursuant to Fed.R.Civ.P. 11, 26 U.S.C. § 7430 and 28 U.S.C. § 1927.

The Government interposes an affirmative defense that the money in the accounts was deposited with fraudulent, rather than donative, intent and thus can be levied by the Internal Revenue Service. In support of this contention, the Government alleges that the accounts were opened during the time plaintiff, Ellen Marshall, was indebted to the United States and that at least some of the funds were from individuals other than the donor, the mother of the plaintiff, Ellen Marshall. In addition, the Government contends that the taxpayer Ellen Marshall has not used the money in the accounts in accordance with mandates of UGMA. Specifically, the Government asserts that the money in the custodial accounts was commingled and that loans from these accounts were improperly made to plaintiff's husband and other individuals. Consequently, the Government contends that the accounts are subject to the IRS's Notice of Levy ("Levy").

The action was tried non-jury before me upon consent of the parties. *See* 28 U.S.C. § 636(c)(1); Fed.R.Civ.P. 73(a). The following constitutes the court's findings of fact and conclusions of law: *See* Fed.R.Civ.P. 52(a).

## FINDINGS OF FACTS

A. *The Grandmother's Alleged Donative Intent*

SelmaLee Kaufman[1] is the mother of the plaintiff, Ellen Marshall, and the grandmother of Sabrina and Grant Marshall. It is Ms. Kaufman's practice to give twenty-five thousand dollars ($25,000) by check to each of her grandchildren on or about their first birthday and five thousand dollars ($5,000), thereafter, on or about each subsequent birthday. In accordance with this practice, Ms. Kaufman gave to her daughter, Ellen Marshall, for Sabrina, her granddaughter, a gift of $25,000 in 1984 and gifts of $5,000 for the years 1985 through 1990. In 1991, Ms. Kaufman allegedly gave Sabrina a gift of $3,000. Ms. Kaufman testified that the money was to be a gift or "nest egg" for her grandchildren. (Tr. 5, 7, 9, 12)[2] Ellen Marshall testified

---

1. SelmaLee Kaufman's maiden name is Grant.

2. The abbreviation "Tr." refers to the transcript of the bench trial held on March 24 and March 25, 1993. The number following the abbreviation "Tr." refers to the page in the transcript wherein the specific reference can be found.

that the purpose of the gifts was for her children's education. (Tr. 94) However, Ellen Marshall testified that her mother never told her specifically what to do with the gifts. (Tr. 100–101)

Similarly, Ms. Kaufman testified that she gave to Ellen Marshall gifts of $25,000 in 1988, $5,000 in 1989 and 1990 and $3,000 in 1991 for her grandson, Grant. In total, Ms. Kaufman allegedly provided gifts of $58,000 to her granddaughter Sabrina and $38,000 to her grandson Grant. Ellen Marshall testified that she deposited all of these checks from SelmaLee Kaufman in The Bank of New York. (Tr. 95–97–98)

Ms. Kaufman followed the same gift giving policy with respect to her other grandchildren. The children of her other daughter, Suzie Goldstein, who is not a party to this lawsuit, were also given checks of $25,000 on their first birthday, $5,000 thereafter on each subsequent birthday through 1990 and $3,000 in 1991. (Tr. 7, 8) With respect to these other grandchildren, SelmaLee Kaufman gave her gifts directly to Suzie Goldstein, her other daughter, for the benefit of those grandchildren.

Of the twenty-five gifts made to her four grandchildren over the course of the years, photocopies of checks representing eighteen of those gifts were obtained. All, but one, of those drafts were made payable to one of the four grandchildren. *Plt's Ex.* 1. The one check not made payable to a grandchild was made payable to Ellen Marshall Grant, SelmaLee Kaufman's daughter, the mother of Sabrina and Grant.

However, one check made payable to Sabrina Marshall was endorsed "For Deposit Only, 4 Anchorage Lane Owners, Inc." *Plt's Ex.* 1 at p. 58; (Tr. 20, 26) Ellen Marshall contends that such an endorsement was a mistake. (Tr. 28) Ellen Marshall testified that she and her mother had no knowledge of Anchorage Lane Owners, Inc. and that she was neither a principal of this entity nor had any transactions with this entity. (Tr. 88) The court finds Ellen Marshall's testimony credible in this regard. In fact, the photo-

stat of the back of the check may belong to another check unrelated to this case.

Ms. Kaufman testified that she did not intend to retain any control over the gifts she made nor to take any of the money back. (Tr. 7, 8) Ms. Kaufman testified that once the gifts were given to her daughter she did not know what happened to the money or how it was handled. (Tr. 12, 13) Ms. Kaufman testified that the money was given to her daughters with the expressed purpose to be used for the grandchildren. (Tr. 13) She never told them in what form to use the money. (Tr. 13)

Ms. Kaufman further testified that prior to the instant litigation she did not know that Ellen Marshall had made loans with some of the funds given to Sabrina or Grant. (Tr. 14) Ms. Kaufman testified that the first time her daughter indicated that she was having tax problems was in 1992. (Tr. 17) The court finds Ms. Kaufman's testimony credible.

B. *The Government's Tracing of the Grandmother's Gifts*

1. Early Gifts to Sabrina

In attempting to trace how the proceeds of the gifts were used, the Government subpoenaed a representative of The Bank of New York (the "Bank") to testify regarding certain Bank of New York documents. Beginning with custodial certificate of deposit ("CD") 9319, which is the earliest record maintained by the Bank, the documents indicate that $21,090.01 was deposited into CD 9319 on January 9, 1985. While Ellen Marshall testified that the money in this CD was from Ms. Kaufman's original gift to Sabrina of $25,000 in 1984, she claims not to know what happened to the remaining $3,909.99.[3] (Tr. 103)

Exhibit B reflects that sometime between January 7, 1986 and May 29, 1986 the balance of the CD decreased by $4,485.69. As a result of missing bank records, the Bank representative was not able to identify how or why the balance went down. (Tr. 57) Likewise, Ellen Marshall was unable to pro-

---

**3.** The actual amount unaccounted for is larger than the $3909.99 since the unaccounted for amount would have included interest which had

accumulated from the date the account was opened until January 9, 1985, the date of the first available record of this CD. *Gov't Ex.* B at p. 1.

vide any insight into why the balance decreased. (Tr. 103) Upon the closing of this account, the proceeds were deposited in Ellen Marshall's husband's business account. (Tr. 37) [4]

With respect to CD 9629, the documentary evidence reveals that a custodial CD for Sabrina was opened on November 24, 1986 with a balance of $5,000. *Gov't Ex.* D. The source of the money deposited in this CD was cash. (Tr. 37, 122). The CD was, thereafter, rolled over into CD # 0580. This CD was closed on February 26, 1988 with a balance of $5334.85. The closing check was made payable to Ellen Marshall and deposited in Citibank account # 49174474.[5] *Gov't Ex.* E.

With respect to CD 9603, the documentary evidence reveals that this custodial CD for Sabrina was opened on July 17, 1986 with a balance of $5,000. *Gov't Ex.* F. CD 9603 was closed on July 16, 1987 with a balance of $5,294.55. The closing check was made payable to Ellen Marshall and deposited in her husband's business account.

With respect to CD 0770, the documentary evidence reveals that this custodial CD for Sabrina was opened on July 29, 1987 with a balance of $5,000. *Gov't Ex.* H. The source of this check was a $5,000 check (check # 140) from SelmaLee Kaufman to Sabrina Grant, dated July 20, 1987. *Gov't Ex.* H-1. This CD was closed on February 26, 1988 with a balance of $5,147.09. The closing

check was made payable to Ellen Marshall and deposited in Citibank account # 49174474—the same account that the proceeds of CD 9629 were deposited into.[6]

On July 20, 1988, a similar custodial CD (# 1661) was opened for Sabrina with a balance of $5,000 (check # 149, dated July 19, 1988). *Gov't Ex.* T-2; *Plt's Ex.* 1 at pp. 5–6. As of the time of trial, this CD remains open with no additional deposits having been made since the CD was established. As of the time of trial, the balance was $6,675.49. *Gov't Ex.* T-2(a).

2. Early Gifts to Grant

On July 20, 1988, SelmaLee Kaufman's gift of $25,000 [7] (check # 150, dated July 19, 1988) was deposited into CD 1679 with "Ellen Grant Kaufman as custodian for Grant Marshall." *Gov't Ex.* T-1; *Plt's Ex.* 1 at pp. 5–6. One year later, Ms. Kaufman's gift to Grant of $5,000, in the form of a check # 182, dated July 18, 1989 (*def's ex.* T-3), was added to a rolled over CD which resulted in a balance of $31,825. This new CD (# 2750) was set to expire on July 20, 1990. *Gov't Ex.* T-4.[8]

3. UGMA Gifts to Sabrina and Grant

i. *Sabrina's Gifts*

Account # 438–945305 (hereinafter "# 305"), Sabrina's UGMA's account at The Bank of New York, was opened on March 22, 1989. On July 19, 1989, Sabrina's grandmother's 1989 $5,000 gift was deposited into this account.[9] *See Plt's Ex.* 1 at pp. 5–6; *Gov't Ex.* Q at p. 2. Again, on April 12, 1990,

---

4. As of July 9, 1987, the date of the last record of this CD, there was a balance of $19,087.61. *Gov't Ex.* B at p. 14.

5. *See infra* Findings of Fact at (C)(2).

6. *See infra* Findings of Fact at (C)(2).

7. This account was improperly issued as a "trust" account by The Bank of New York. *See* Tr. 75–76. However, the parties have stipulated that this account would be considered a proper "custodial" bank account for the purposes of this case.

8. This CD presently is identified as Cd 696–0152032.

9. Government exhibit L–3(a) is a photocopy of the front side of a check for $5,000 (# 181) from SelmaLee Grant (a/k/a Kaufman) which was made payable to Sabrina Marshall. The check is

dated July 18, 1989. Beneath that check is a copy of a deposit slip which indicates that the $5,000 was deposited in *cash*.

The representative of The Bank of New York was not able to explain why these documents were photocopied together on the same piece of paper. The representative claims that if check # 181 was cashed, the deposit slip on L–3(a) would not have been found in the same area of the microfilm records as cancelled check # 181 and thus could not have appeared on a single photocopy. (Tr. 68) Thus, according to the Bank representative what occurred was impossible.

Moreover, according to the Bank representative, because check # 181 was issued by Irving Trust, it could not pursuant to Bank policy have been cashed. (Tr. 69) Thus, based on these impossibilities and the fact that Government's exhibit Q indicates a $5,000 deposit on July 19, 1989, one day after the date of check # 181, it

another $5,000 gift from Sabrina's grandmother was deposited into this account. *See Plt's Ex.* 1 at pp. 53–54, *Gov't Ex.* Q at p. 2. On July 18, 1991, the Bank records reflect an additional $5,000 deposit into this account. *Gov't Ex.* Q at p. 9. The Bank's records of that date do not reflect a deposit of $3,000 into Sabrina's custodial account—the date which corresponds to the date when Ms. Kaufman gave Sabrina a gift of $3,000. *Plt's Ex.* 1 at pp. 1–2. The additional $2,000 deposit reflected in this custodial account is unexplained.

### ii. Grant's Gifts

On January 17, 1989, the date Grant's custodial account was opened, $5,000 cash was deposited into custodial account # 438–944670 (hereinafter "# 670"). *Gov't Ex.* O; (Tr. 44, 58) The representative of the Bank testified that this could have resulted from either a "cash" deposit or by the cashing of a Bank of New York check. (Tr. 57–58)

Also deposited into Grant's custodial account was a check from his grandmother for $5,000, dated July 25, 1990. *Gov't Ex.* O–1 and R. As noted above, a $3,000 check (# 1142) from SelmaLee Kaufman made payable to Grant, dated July 31, 1991, was given to Ellen Marshall. There is no documentation regarding where this check was deposited.

On cross-examination, plaintiffs successfully demonstrated that some of The Bank of New York's failure to trace specific gifts supposedly deposited in the various custodial accounts resulted not necessarily from plaintiff's secretion of assets but rather from an inability to locate all the necessary records. (Tr. 53–55). In fact, the representative of The Bank of New York failed to review the account cards maintained at the local branch of the Bank of New York.

### C. The Loaning of Money from the Custodial Accounts

**1.** To Sabrina and Grant Marshall's father and Ellen Marshall's husband

Ellen Marshall testified that she loaned her husband $19,500 from the proceeds of CD 9319. (Tr. 105) The check drawn on that CD for $19,527 was endorsed by Ellen Marshall and deposited by her husband. *Gov't Ex.* C. A check for $5,294.58 was also drawn on CD 9603 made payable to and endorsed by Ellen Marshall. That check was also deposited by her husband. (Tr. 108); *Gov't Ex.* G.[10] The proceeds of both of these CD's were loaned by the plaintiff, Ellen Marshall, to her husband in 1987 from her daughter's custodial accounts.

There was no written agreement documenting the loan or any notation regarding any interest rate. (Tr. 105, 153) While Ellen Marshall testified that she never discussed with her husband an appropriate interest rate on the loan, her husband testified that an interest rate of twelve percent had been agreed to. (Tr. 105, 153)

The loan took place after Ellen Marshall and her husband were notified of their tax deficiency and after they filed a petition in the tax court contesting the deficiency. (Tr. 153) Ellen Marshall testified that the money was needed to finance her husband's law practice. (Tr. 109, 154)

Mr. Marshall testified that the loan proceeds were needed during the pendency of litigation involving the dissolution of his former law partnership and were to provide capital to develop his successor law practice in the personal injury and medical malpractice areas. (Tr. 154) Mr. Marshall testified that at the time he was loaned the money from his wife, he had already expended $50,000 in legal fees in connection with the dissolution of his former law partnership. (Tr. 155) Mr. Marshall testified that three hundred thousand dollars in accounts receivables were owed to him by his former law partnership on October 1, 1985 and that as of the date of trial no portion of those funds had been paid to him. (Tr. 154–155).

Mr. Marshall testified that he believed Ellen Marshall had complete control over the

---

appears that Ellen Marshall merely filled out the deposit slip improperly as "cash" and that the $5,000 check was a gift consistent with SelmaLee Kaufman's gift giving policy.

**10.** The parties have stipulated that the middle check found on Government's exhibit C has nothing to do with this case.

custodial accounts. (Tr. 155) Mr. Marshall further testified that at the time he borrowed the money it was his understanding the money lent to him "were a gift from their grandmother and that Ellen [Marshall], as custodian, had the right to make investments of that money by loans as long as they were prudent and in conformity with a prudent man's rule, a business person's rule." (Tr. 155). As of the date of trial, he has not repaid either the interest on or the principal of the loans from his children's custodial accounts. (Tr. 153–154)

SelmaLee Kaufman testified that her son-in-law in 1989 also received a loan from her for $25,000. This loan was documented in a handwritten I.O.U. signed by him, dated October 13, 1989. *Gov't Ex.* A. Included in that I.O.U was the principal amount borrowed, the date the money was lent and the fact that interest would be paid.

The testimony also revealed that Selma-Lee Kaufman loaned her son-in-law $35,000 from her business. Similarly, this loan was documented in that same handwritten I.O.U. *Gov't Ex.* A. Included in that I.O.U was the principal amount borrowed, the date the money was lent and the fact that interest would be paid.

According to Mr. Marshall, these loans from SelmaLee Kaufman, individually, and from her business were made because: (1) he had still not received any of the proceeds from the dissolution of his former law partnership; (2) an additional $50,000 had been laid out for legal fees in connection with that dissolution; and (3) monies were needed for disbursements in certain personal injury and medical malpractice cases he was handling. (Tr. 157) To date, neither of these loans have been repaid.

### 2. To Louis Cutajar

Ellen Marshall loaned $5,334.85 to her friend, Louis Cutajar, by endorsing over to him CD 0580—funds from Sabrina's 1986 custodial CD. (Tr. 112–113); *Gov't Ex.* E. She also loaned him an additional $5,147.09 by endorsing over to him CD 0770—also funds from Sabrina's custodial CD. (Tr. 115); *Gov't Ex.* I. Both loans were made on February 26, 1988. *See Gov't Ex.* E and I. There was never a written loan agreement

between Ellen Marshall and Mr. Cutajar. (Tr. 115) However, Ellen Marshall testified that interest would be paid based on the going rate. (Tr. 115)

Ellen Marshall claims that these loans were repaid in full. (Tr. 116). However, only a check, dated March 6, 1989, for $7,000 from Mr. Cutajar made payable to Ellen Marshall was produced at trial. (Tr. 116) This check was deposited on March 22, 1989 into account # 305, Sabrina's custodial account.

This check is the only evidence supporting any repayment of the Cutajar loan to Sabrina. *Gov't Ex.* Q at p. 2. While Ms. Marshall claims the full amount of the loan was repaid, she does not remember in what form Mr. Cutajar repaid any outstanding amount. (Tr. 116) It does not appear from the court's review of the evidence that any other check was ever deposited into any of the various custodial accounts of Sabrina to reflect a complete repayment by Mr. Cutajar of the loans. *See* (Tr. 117–121) It is not clear whether the $7,000 check was even a partial repayment of the loans.

### D. *The Tax Lien*

The tax liabilities at issue in the instant case arose in connection with certain limited partnership tax shelter investments Ellen Marshall, plaintiff, and her husband made in 1982, 1983 and 1984. In 1985, Ellen Marshall's husband received notification that the IRS was auditing those tax shelters. On or about June 9, 1986, he received from the IRS a Notice of Deficiency. Thereafter, the Marshalls filed a joint petition in tax court seeking a redetermination of the IRS's finding of a tax deficiency.

On August 23, 1991, the IRS served a Levy on The Bank of New York restraining the various custodial accounts. On September 16, 1991, plaintiffs commenced the instant action and moved by order to show cause requesting that a temporary restraining order be issued enjoining the Government from enforcing the Levy. On September 17, 1991, United States District Judge Arthur D. Spatt granted the temporary restraining order preventing the Government

from enforcing its Levy against bank accounts 438–944670 for $11,482.93 and 438–945305 for $25,415.38 and a certificate of deposit # 696–0152032 for $37,383.63.[11]

## CONCLUSIONS OF LAW

### A. Discussion

■ To prove a wrongful levy, plaintiffs are required to show: (1) the IRS filed a levy covering taxpayer liability against property held by Sabrina and Grant Marshall; (2) Sabrina and Grant Marshall had an interest or lien on that property superior to the interest of the United States; and (3) the levy was wrongful because Ellen Marshall did not own the property. *Century Hotels v. United States*, 952 F.2d 107, 109 (5th Cir.1992); *Texas Commerce Bank–Fort Worth, N.A., v. United States*, 896 F.2d 152, 156 (5th Cir. 1990); *Hall v. United States*, 1992 WL 394160 at *5 (N.D.Ga. Oct. 28, 1992).

### 1. Burden of Proof

■ In the typical wrongful levy action case, pursuant to 26 U.S.C. § 7426, the initial burden of proof is on the plaintiff to prove title to or an ownership interest in the property levied upon by the Government and that the Government levied upon the property because of a tax assessment against another taxpayer. *Morris v. United States*, 813 F.2d 343, 345 (11th Cir.1987); *Hall*, 1992 WL 394160 at *5; *William L. Comer Family Equity Trust v. United States*, 732 F.Supp. 755 (E.D.Mich.1990); *Xemas, Inc. v. United States*, 689 F.Supp. 917 (D.Minn.1988). This burden is appropriate when the plaintiffs, in the instant case, are viewed as Sabrina and Grant Marshall with Ellen Marshall, their mother, as guardian. *See* Fed.R.Civ.P. 17(c). Here, in effect, the children are suing the Government claiming wrongful levy on their bank accounts.

■ Plaintiff, Ellen Marshall, is also suing in her individual capacity. Ellen Marshall is suing as a "wronged" custodian who seeks to prevent the levy on the custodial funds *viz.* her status as an UGMA fiduciary for those funds. However, besides being the custodian, Ellen Marshall is also the delinquent taxpayer because of whose tax liabilities the Government seeks to levy on the funds owned by Sabrina and Grant Marshall. Thus, with respect to her individual status in this case, the burden is on the plaintiff/custodian to prove that he/she does not have title to or an ownership interest in the levied property.

■■ Under either circumstance, the burden then shifts to the Government to prove by "substantial evidence" (*Century Hotels*, 952 F.2d at 109; *Hall*, 1992 WL 394160 at *5; *Xemas*, 689 F.Supp. at 922), the nexus between the property and the taxpayer. *Century Hotels*, 952 F.2d at 109; *Morris*, 813 F.2d at 345; *Hall*, 1992 WL 394160 at *5; *Xemas*, 689 F.Supp. at 922. In any event, under either situation, the plaintiff has the ultimate burden of proving that the levy was wrongful and should be overturned. *Century Hotels*, 952 F.2d at 109; *Hall*, 1992 WL 394160 at *5; *Comer*, 732 F.Supp. at 755; *Xemas*, 689 F.Supp. at 922.

If plaintiff fails to sustain the burden, the levy on the property interest will be upheld. *See Hall*, 1992 WL 394160 at *6 (*custodial account* can be levied where husband and wife attempted to conceal funds from the IRS by forming shell corporation and placing funds in UGMA accounts allegedly for the benefit of their children); *Comer*, 732 F.Supp. at 760 (property held in the form of a *trust* can be levied where trust is an "alter ego" of the taxpayers and where: (a) property transfer lacked sufficient consideration; (b) taxpayers were insolvent at the time of transfer; and (c) taxpayers lived on the property as though it were their own notwithstanding the fact it had been purchased by the trust); *Xemas*, 689 F.Supp. at 922 (property held in a *trust* can be levied where husband and wife attempted to conceal funds from the IRS by forming a shell trust, by filing "fraudulent" conveyances and where the couple continued to "have complete bene-

---

11. On December 11, 1992, Judge Spatt granted the Bank of New York's motion for summary judgment dismissing the negligence action against it. The Bank of New York, however, remains in the action as a "stakeholder."

ficial use and enjoyment of the property and without the payment of rent").

As noted below, plaintiffs, Ellen Marshall, individually, and Sabrina and Grant Marshall, as owners of the funds have only sustained their burden for certain specified funds in the accounts.

### 2. Donative Intent

UGMA provides the following:

7–4.2 Manner of making gift.

(a) An adult person, may during his lifetime, make a gift of ... money to a person who is a minor on the date of the gift:

\* \* \* \* \* \*

(3) If the subject of the gift is money ... by paying or delivering it to a broker or a financial institution for credit to an account in the custodian's name, followed, in substance, by the words: "As custodian for .................

(name of minor)

under the New York Uniform Gifts to Minors Act.

A further provision of the Act provides the following:

7–4.3 Effect of gift

(a) A gift made in a manner prescribed by this part is irrevocable and conveys to the minor indefeasibly vested legal title to the ... money given, but no guardian of the minor shall have any right, power, duty or authority with respect to the custodial property except as provided in this part.

To be properly considered an UGMA account, the donor must have made the gift "in a manner prescribed by this part." N.Y.EPTL § 7–4.3. As an *inter vivos* gift, for the bank accounts at issue in the instant case to be considered proper UGMA accounts two elements must be established: "donative intent and delivery of either the subject matter of the gift or of an instrument of gift." *Gordon v. Gordon,* 70 A.D.2d 86, 419 N.Y.S.2d 684, 687 (2nd Dept.1979). "The essential element of donative intent refers to the grantor's initial intent at the time of the conveyance." *Id.* 70 A.D.2d 86, 419 N.Y.S.2d at 688.

In *Buder v. Sartore,* 774 P.2d 1383 (Colo. 1989), the Colorado Supreme Court found that certain custodial accounts were properly classified as UGMA accounts under the following circumstances: In *Buder,* a grandfather made substantial cash gifts to his two grandchildren.

The cash gifts, typically in the form of checks made directly payable to the children, were given to Buder [the father] with the tacit understanding that he was to safeguard the money and invest it on behalf of the children. Buder would then deposit the funds in bank accounts marked either 'Theodore A. Buder, in Trust for Theodore A. Buder, Jr.' or 'Theodore A. Buder in Trust for Cori Marie Buder'

*Id.* at 1384. The father thereafter invested some of that money in stocks which were purchased "in Buder's name as custodian for the children under the Uniform Gifts to Minors Act." *Id.* Based on these facts, the trial court found that the cash "gifts were given with the intention that the UGMA applied to [them]." *Id.* at 1385 n. 2 (*quoting* unreported decision of trial judge) [bracketed material in original].

In *Matter of McLaughlin,* 126 Misc.2d 817, 483 N.Y.S.2d 943 (Sur.Ct.Nassau Cty.1985), the court found that custodial accounts had been properly opened under the following circumstances: In *McLaughlin,* the decedent opened a savings account in the form of a Totten trust naming her two daughters as beneficiaries. Thereafter, less than two years later, the mother withdrew approximately two thirds of the money from this account and established two separate UGMA accounts with herself as the custodian for each account. One year later, the mother closed both UGMA accounts and transferred the remaining balances to two separate joint accounts, naming one daughter as a Totten trust beneficiary on each account. These accounts continued in this form until the mother's death. The joint tenant named with decedent on each joint account did not make a claim for these funds, but rather testified that "the accounts were established for convenience only as to facilitate withdrawals in the event that the mother, who was ill, was unable to accomplish this herself. *Id.* 126 Misc.2d 817, 483 N.Y.S.2d at 944. Based on these facts, the court found that a

donative intent had been established when these accounts were originally opened. In further support of its finding of donative intent, the court noted that at the time the *custodial accounts* were opened, the deposit of money in these accounts did not render the decedent insolvent. As a result, the court found that the estate assets were not within the reach of estate creditors as those claims arose after the date of the creation of the UGMA accounts. The court further found that the status of the money in the former custodial accounts did not change since the funds when placed in the more recent non-custodial account never became the mother's property because title to the funds indefeasibly vested in the children/donees.

Notwithstanding certain improprieties by the custodian, the court in *Allen v. Allen,* 301 So.2d 417 (La.Ct.App.1974), found that the custodial account was properly created. In *Allen,* the parents initially placed certain monies in a savings account in their children's names. Thereafter, the account was closed with a check issued to both parents for the balance. The check was then deposited in a generic checking account. A few days thereafter, two separate savings accounts were opened, one for each child, with both parents as "guardian" for each child. Either parent was permitted to make withdrawals.

Through the years, additional funds were deposited in the accounts by the parents from their earnings and *"on one occasion from money repaid to the father on a loan previously made to his sister." Id.* at 418 [emphasis added]. During this time, [t]here was shifting of the funds on deposit from one type of certificate or account of another," but always within the same bank. *Id.* Sometime thereafter, the accounts were changed to reflect a "custodial" account for the benefit of each child. At that point, only the children's mother had authority to make withdrawals.

The father testified that the primary purpose for these accounts was "for tax purposes," while the mother testified the primary reason for the accounts was "to build a fund for the children's education."

Notwithstanding the parents' failure to sign a deed of gift pursuant to Louisiana's Gift to Minors Act, based on these facts, the court determined that proper "custodial" accounts had been created. The court found that the monies in the two accounts were owned by the children and that donative intent was established by the fact that "gifts of money [were made], accompanied by real delivery through deposit of the money in *savings accounts* in the name of fiduciary for the minors." *Id.* at 419 [emphasis added]. The court noted that

> [a]ppellant's own testimony was that this was done for tax purposes, which necessarily presupposes in [sic] irrevocable gift to lawfully receive the tax advantage of separate income. The accounts were continuously carried in the names of fiduciaries for the named minors. The permanent and irrevocable nature of the donations is further demonstrated by the fact that no funds were ever withdrawn in the more than ten years since the initial donations were made.

> The only factors weighing against the irrevocability of the donations is that both parents at first and then one parent had the right to make withdrawals and to that extent retained control of the funds. However, the donees are minors and someone had to act for them—logically, the parents.

*Id. But see, State of Ohio v. Keith,* 81 Ohio App.3d 192, 610 N.E.2d 1017 (1991) (no donative intent found where shortly after opening UGMA account custodian withdrew certain money which she claimed was a loan authorized by herself, as custodian, to herself as an individual).

In *Gordon,* 419 N.Y.S.2d at 684, UGMA funds were protected even though the funds ultimately placed in the UGMA account came indirectly from the children's paternal grandfather. The grandfather gave his son $40,000 which was then deposited into two certificate accounts. One was clearly denominated as an UGMA custodial account with his son as custodian for his granddaughter. The account card was signed by the grandfather as "donor." The second account was initially opened as a joint account between grandfather and son. However, sometime thereaf-

ter, the grandfather's name was removed from the second account and it was re-denominated in the form of his son, as custodian, for his grandson. Notwithstanding the initial posture of the second account, the court found that both accounts were opened as "custodial" accounts. The court gave little weight to conclusory affidavits claiming the accounts were opened for tax purposes noting that such affidavits were insufficient to rebut the evidence of donative intent where the documentary evidence supports the creation of custodial accounts.

▇▇▇ As noted in *Gordon*, while the structure of UGMA is superficially analogous to a trust, with the custodian in the role of the trustee, an UGMA account is different in that the "minor obtains indefeasibly vested legal title to the property which is gifted in the manner prescribed by statute." *Gordon*, 419 N.Y.S.2d at 687. In addition, an UGMA account unlike a trust, does *not* afford any rights, legal or equitable, to the donor of the conveyed property. *Id.* In addition, the UGMA account is irrevocable. *Id.*

On the other hand, in *Hall*, 1992 WL 394160, the court found no donative intent. In *Hall*, the plaintiff wife and her husband had attempted to conceal the husband's funds from the IRS by placing them in bank accounts which were in the names of their daughters with the wife as custodian. The court found that the money paid to the wife pursuant to a consulting agreement with her husband's former employer was in reality wages being paid to the husband for his work. Consequently, the court found that such funds were not deposited in the children's accounts with donative intent. As a result, the court permitted the United States to levy on each of plaintiffs' children's custodial accounts.

Notwithstanding its ruling permitting a levy, the court expressly refused to permit the levy against the entire account. The court exempted from the levy that portion of the custodial account which constituted the amount of a *gift* from the grandmother to the granddaughter. *Id.* at \*5. *See Friedman v. Mayerhoff*, 592 N.Y.S.2d 909 (Civ.Ct. [Small Claims] 1992) (since the owners of a custodial account are the children and not the custodi-

an, a judgment creditor cannot attach custodial funds unless the account was established for "a fraudulent purpose and with the aim of shielding assets from application to a judgment"); *In re Marriage of Jacobs*, 128 Cal. App.3d 273, 180 Cal.Rptr. 234 (1982) (no donative intent found where *husband* drew up and signed along with his *wife* a backdated handwritten "note" indicating a promise to pay certain monies to his children and where husband's custom was to place the family's extra money or savings in "accounts in the children's names to avoid taxes" and where he told his wife that they "would still have use of the funds, even though the money was in the children's names").

### 3. Reasonable Person Standard

The legislative history of UGMA notes that the custodian of an UGMA account

> 'is to have almost all of the rights of the owner, except that he [or she] must act as a prudent [person]. He [or she] is not bound by any rule limiting fiduciaries in holding, transferring and investing fiduciary funds. *Third parties may deal with him as if he were the owner and are not bound to inquire* ... unless they have knowledge that he has committed a breach of his obligation, or ... facts that ... will amount to bad faith.'

*Matter of Levy*, 97 Misc.2d 582, 412 N.Y.S.2d 285, 287 (Sur.Ct.Nassau Cty.1978) (*quoting* McKinney's Session Laws of 1956, p. 1808) [emphasis added in *Levy* ].

> It appears that the custodian has almost all of the incidents of ownership while the minor at all times has *indefeasible* legal title.

*Levy*, 412 N.Y.S.2d at 288 [emphasis in original].

The UGMA statute provides that

> (e) The custodian, notwithstanding statutes restricting investments by fiduciaries, shall invest and reinvest the custodial property as would a prudent [person] of discretion and intelligence who is seeking a reasonable income and the preservation of capital

> (f) The custodian may sell, exchange, convert or otherwise dispose of custodial

property in the manner, at the time or times, for the price and upon such terms as he [or she] deems advisable.

N.Y. EPTL § 7–4.4(e) and (f).

In *Levy*, the court, in considering whether the custodian invested the custodial property as a person of prudent discretion and intelligence, looked to the "family circumstances" that existed at the time the transaction occurred. *Levy*, 412 N.Y.S.2d at 291. In so doing, the court noted, that but for certain improper conduct on part of the mother/custodian, the court would have found that use of the custodial property in paying off "daddy's debts" would have been "for the benefit" of the minor children. *Id.* at 290, 291. In making this conclusion, the court in *Levy* necessarily had to find that paying off the father's debts would have been a "prudent decision."

In *Buder*, 774 P.2d at 1383, the Colorado Supreme Court, after finding that a proper UGMA account had been created, was presented with the question as to whether the father as custodian of certain accounts had violated his fiduciary obligation to his children. The father was alleged to have failed to invest the children's funds as a prudent person, failed to provide an accounting, converted the funds to his own use and commingled his funds with those of his children. The court held that two different standards of care applied.

The court noted that prior to July 1, 1984, the custodian's standard of care, which is identical to the standard under New York's UGMA, was the following:

[t]he custodian, notwithstanding statutes restricting investments by fiduciaries, shall invest and reinvest the custodial property as would a prudent [person] of discretion and intelligence who is seeking a reasonable income and the preservation of capital

774 P.2d at 1388 (*quoting* section 11–50–105(5), 4 C.R.S. [1973]). Subsequent to July 1, 1984, the court found that a higher standard of care was imposed. This higher standard of care looked to how one would invest if the property was owned by someone else. The higher standard was:

in dealing with custodial property, a custodian shall observe the standard of care that would be observed by a prudent person dealing with property of another and is not limited by any other statute restricting investments by fiduciaries.

774 P.2d at 1385 (*quoting* section 11–50–113(2), 4B C.R.S. [1987]). Under either standard, the court found the father to have violated his fiduciary duties by investing in penny stocks which he "knew ... were unsafe investments, which would preserve the children's funds." 774 P.2d at 1386 (*quoting* trial judge's decision).

In *Heath v. Heath*, 143 Ill.App.3d 390, 97 Ill.Dec. 615, 493 N.E.2d 97 (1986), the court found that donative intent existed under the following circumstances. The court in *Heath* had to decide whether certain funds given by the grandfather to his grandchildren were in the nature of a custodial account or merely a loan from the grandfather to his son. In *Heath*, the grandfather gave his son certain monies which were eventually invested in a certificate of deposit in the name of the grandchildren with his son and his son's wife as custodians. Three years later, those monies were then placed in two separate Illinois UGMA accounts, one for each grandchild. The father signed the UGMA signature card for each account and was named the custodian for each account.

The father later contended that the monies given to him were loans from his father, rather than custodial gifts for his children. On that basis, he claimed it was proper to withdraw the monies. Significant, for the instant case, is the court's conclusion that because the monies where *always* placed in "custodial" accounts in *some form*, the court would not give credence to the father's contention that the money was a loan from his father to pay bills. Even more significant is the fact that when the court upheld the custodial nature of the accounts, it noted there was "no testimony regarding the purpose of the loan or how the monies were to be used." *Id.* 97 Ill.Dec. at 619, 493 N.E.2d at 101. In the instant case, Mr. Marshall provided uncontradicted testimony with regard to the purpose of the loan from the custodian and how the proceeds were to be used.

### B. Application of Facts

#### 1. Donative Intent

■ "The essential element of donative intent refers to the grantor's initial intent at the time of the conveyance." *Gordon*, 419 N.Y.S.2d at 688. SelmaLee Kaufman testified without contradiction that her intent at the time she made her yearly gifts to her grandchildren by giving Ellen Marshall checks in her grandchildren's names was to provide a "nest egg." The Government has been unable to establish that the checks given by Ms. Kaufman to her daughter were for daughter's use rather than legitimate gifts for her grandchildren. The fact that Ms. Kaufman delivered the gifts to her daughter and not to the donees, children of tender years, does not affect the court's conclusion. *Buder*, 774 P.2d at 1383; *Heath*, 97 Ill.Dec. at 615, 493 N.E.2d at 97; *Gordon*, 419 N.Y.S.2d at 684. In addition, SelmaLee Kaufman's failure to give explicit instructions to her daughter in how to invest the money does not vitiate this court's finding of donative intent. *Buder*, 774 P.2d at 1383; *Heath*, 97 Ill.Dec. at 615, 493 N.E.2d at 97.

The fact that Ms. Kaufman followed the identical gift giving pattern for her other daughter's children supports this court's conclusion that Ms. Kaufman had a donative intent under UGMA. Moreover, the uncontested testimony that Ms. Kaufman did not know her daughter had a tax problem until 1992 supports this conclusion. Consequently, this court finds that SelmaLee Kaufman has established the necessary donative intent under UGMA.

The instant case is not inconsistent with *Sussman v. Sussman*, 47 N.Y.2d 849, 418 N.Y.S.2d 768, 392 N.E.2d 881 (1979). There, the New York State Court of Appeals held that where a document evinces at most an intention to make a *future* donative transfer of the proceeds of *unspecified* securities to certain minor grandchild and where the bonds nor their proceeds were never physi-

cally delivered to the custodian of the grandchildren's account, no gift was created under UGMA. Here, the delivery of the gifts were made contemporaneously with the donative intent.

#### 2. Statutory Requirements of UGMA

■ Notwithstanding a proper donative intent by Ms. Kaufman, this court must decide whether the form in which the gifts were made violate UGMA to such an extent as to not afford protection against the IRS's levy. Besides the technical requirements of UGMA, the court must determine whether there was proper "delivery" of the gifts to the donees. The case law is clear that the protection of UGMA will extend to gift giving even when the precise requirements of the statute are not followed. *Buder*, 774 P.2d at 1383; *Heath*, 97 Ill.Dec. at 615, 493 N.E.2d at 97; *McLaughlin*, 483 N.Y.S.2d at 943; *Gordon*, 419 N.Y.S.2d at 684; *Allen*, 301 So.2d at 417.

This case is not unlike *Buder*, where the fact that a grandparent gave certain monies to his/her child with the understanding that the money was to be used for the benefit of the grandchildren, did not remove the gifts from the protection of UGMA. In *McLaughlin*, *Gordon* and *Allen*, cases which reflect either the transfer of funds from an UGMA account to a non-UGMA account or the transfer of funds from a non-UGMA account to an UGMA account, the courts did not find that the transfers warranted invasion of the funds.[12]

This court finds that most of the checks from SelmaLee Kaufman were "delivered" to the grandchildren (except for checks # 1131 and # 1142, a $5,000 "cash" deposit into account # 670, dated January 17, 1989 and a $5,000 "cash" deposit into CD 9629 on November 24, 1986). The "delivered" checks were deposited by Ellen Marshall in custodial bank accounts or CD's under UGMA.[13] *See Gov't Ex.* B, D, F, Q, R and T(1)–(5) [CD # 9319, 9629, 9603, 0770, 1679, 2750 and 1661;

---

**12.** This court is cognizant of cases such as *Hall*, 1992 WL 394160, where the court did not give a bank account the protection of UGMA when not all of the statutory prerequisites had not been complied with.

**13.** The Government does not contest that the custodial bank accounts and/or CD's, opened prior to UGMA accounts 670 and 305 which were established in January and March, 1989, respectively, were anything but the equivalent of UGMA accounts.

custodial account 305 and 670). Having established both SelmaLee Kaufman's donative intent and the "delivery" of many of the checks to her grandchildren, the court finds that certain funds are indefeasibly vested in Sabrina and Grant Marshall.[14]

### 3. Synthesis

If a court condones a delinquent taxpayer's or debtor's use of UGMA custodial funds then the court creates a means by which a delinquent taxpayer or debtor can improperly shield assets from the IRS or a creditor and at the same time permit the delinquent taxpayer or debtor to use those funds as if he/she owned them. On the other hand, if the court fails to honor the UGMA arrangement it will deprive the minor of property intended as a gift under the Uniform Gifts to Minors Act.

■ If donative intent exists, then a court must look to the source of the funds to determine whether, and if so, to what extent, a levy may be permitted. Factors to be weighed are: whether the donor is a family member, and if so, whether the family member/*donor* is also the custodian; whether the donor is a delinquent taxpayer or a judgment debtor; whether the person allegedly shielding the funds is some other family member who is not the donor but the custodian; and whether the custodian is a delinquent taxpayer or a judgment debtor.

■ When the IRS seeks to levy on a custodial account where the custodian, although a judgment debtor or delinquent taxpayer, is *not* the donor, the IRS's ability to levy should be limited when the funds at issue were gifts from a non-delinquent taxpayer to another non-delinquent taxpayer. On the other hand, a donor who is a judgment debtor or a delinquent taxpayer and *also* the custodian raises the specter of a conflict of interest. *But see McLaughlin,* 483 N.Y.S.2d at 944 (even where custodian is the donor who wrongfully commingled UGMA funds and the unauthorized act deprived infants of their proprietary interest in

said funds, creditors could not attach the commingled funds).

■ Independent of the above factors, yet worthy of consideration, is the existence of certain "family circumstances" and/or family customs (*Levy,* 412 N.Y.S.2d at 291) which would substantiate how the funds were used. While certain "family circumstances" might support a finding that the use of the child's UGMA funds by the custodian were for the "benefit" of the minor, other factors and circumstances might support a finding that the custodian "converted" the money, *ultra vires,* for personal use.

In *Levy,* 412 N.Y.S.2d at 290–291, the court was satisfied that paying off the father's debts by the mother/custodian from an UGMA account was for the "benefit" of the children to whom the money belonged. The court noted that

> [w]here a parent is custodian, he (or she) is given *sole* discretion by the [UGMA] Act as to what will 'benefit' the child.

*Id.* at 292 [emphasis in original and bracketed material added]. The court espoused this view of the scope of a custodian's obligation notwithstanding evidence that all the minors/donees probably had not consented to such use of the funds.

Once certain monies are expended for the "benefit" of the child, the court must consider whether the use of these funds was prudent. While a custodian has the "sole discretion" to decide "what will 'benefit' the child" (*id.*), that decision must be made by "a prudent [person] of discretion and intelligence who is seeking a reasonable income and the preservation of capital." N.Y. EPTL § 7–4.4(e).

■ The question remains as to why the IRS should be permitted to levy on funds which belong to non-delinquent taxpayer children and were given to them with donative intent by their non-delinquent taxpayer grandmother. The rationale for permitting a levy on these funds is that when a custodian converts protected funds for personal use such funds are no longer used for the "bene-

---

14. *See In re Brown,* 126 B.R. 767, 769 (N.D.Ill. 1991) (where the court found that while the IRS could levy on a *trust* account for the benefit of a minor where the debtor had the right to withdraw all the funds, *the accounts were still the property of the children* ).

fit" of the minor. Having been placed outside the minor's reach, a court may thus infer that this was done to hinder creditors. *Levy*, 412 N.Y.S.2d at 291 (cause of action by infants might exist where custodian's actions were in bad faith or grossly negligent). This inference may be overcome by a custodian's showing that such use was inadvertent or negligent. However, when a custodian's use of such funds appears to be more than merely negligent, creditors may, depending on the circumstances, have a right to levy on such funds which would otherwise not be "attachable." [15]

While this court has found that SelmaLee Kaufman's gifts to her grandchildren were properly deposited in UGMA accounts # 305 and 670 and that such accounts belonged to the grandchildren, the question that arises is how much UGMA protection should be afforded to these various accounts due to: (1) the fact that the accounts were opened when Ellen Marshall and her husband were in debt to the United States; (2) the commingling of the funds in these accounts with the funds in Ellen Marshall's and her husband's personal and business bank accounts; (3) Ellen Marshall's loans to her husband; (4) Ellen Marshall's loans to Louis Cutajar; and (5) Ellen Marshall's failure to account for certain monies that were claimed to be gifts from SelmaLee Kaufman to the grandchildren, but where there is no documentation substantiating their delivery by deposit into any custodial account.

■ The date the custodial accounts were opened is relevant to the motivations behind the Marshalls (not SelmaLee Kaufman with respect to her donative intent) in their use of the custodial accounts. Mr. Marshall testified that he did not remember actually discussing with his wife the couple's petition to the tax court. (Tr. 152) Ellen Marshall testified that prior to 1991, she was not aware that her husband (and herself *viz.* her status as a joint taxpayer) was having tax difficulties. (Tr. 131) While this court would like to conclude that Ellen Marshall did not know of her husband's tax problems,

the fact that the IRS's Notice of Deficiency was addressed to both Mr. and Mrs. Marshall and the fact that she was a joint petitioner in the tax court in 1987 leads this court to find that either Ellen Marshall knew of the tax deficiencies at the time she opened accounts # 305 and 670 or, at a minimum, is deemed on notice that such tax problems existed at the time these accounts were opened in January and March of 1989.

Notwithstanding this conclusion that Ellen Marshall had notice of "her" tax problems when the protected UGMA accounts were opened, the evidence established that Ellen Marshall had opened a variety of custodial bank accounts and CD's for the benefit of her children beginning in 1985, at least one year prior to the IRS issuing the Notice of Deficiency. With respect to these earlier accounts, the Government has not put forth any evidence to support a conclusion that Ellen Marshall knew of her husband's tax problems when they were initially opened. Because Ellen Marshall had opened custodial accounts when she had no knowledge of "her" tax problems, the court cannot find that opening UGMA accounts when she knew of "her" tax liabilities can be a basis for piercing their statutory protections. However, this only means that a finding cannot be made that Ellen Marshall opened the accounts with fraudulent intent, it does not mean that subsequent uses of the funds do not provide a basis for piercing the UGMA protections.

■ Furthermore, the Government has not established that at the time accounts # 670 and 305 were opened Ellen Marshall, plaintiff, and her husband were insolvent or that SelmaLee Kaufman knew her daughter or son-in-law were having tax problems. *See McLaughlin*, 483 N.Y.S.2d at 943 (the court found relevant that depositor was not rendered insolvent when money was deposited in UGMA account); *but see Comer*, 732 F.Supp. at 760 (transfer of property to a trust lacked sufficient consideration and was done at a time taxpayers were insolvent).

---

**15.** Perhaps, as noted in *Buder* and *Levy*, the Marshall children have the right to seek repayment of the money which their parents withdrew

for personal use and to that extent the IRS should be permitted to levy on those funds.

### a. *Loan to Mr. Marshall*

Mr. Marshall's uncontradicted testimony revealed that he borrowed money from the custodial accounts because: (1) he had still not received any of the accounts receivables due him from the dissolution of his former law partnership which at the time of trial was still in litigation; (2) he needed to pay $50,000 in legal fees in connection with that dissolution; and (3) he needed the money for disbursements in certain personal injury and medical malpractice cases he was handling. (Tr. 155) The Government has not produced any witnesses or documents to contradict these statements or shown that the borrowed money had been used for other purposes. *See Heath,* 97 Ill.Dec. at 619, 493 N.E.2d at 101 (court wanted to know the purpose for the loan and how the funds were used when determining whether an account was custodial).

In *Levy,* 412 N.Y.S.2d at 290, 291, the court noted that the use by the custodian-mother of her children's UGMA funds would have been proper to pay off *"daddy's debts,"* if not for certain other transgressions. The use of the funds in this manner was found to be for the "benefit" of the children. In finding the use of the children's custodial funds permissible, the court necessarily must have held that the custodian-mother "invest[ed] ... the custodial property as would a prudent [person] of discretion and intelligence who is seeking a reasonable income and the preservation of capital." N.Y. EPTL § 7–4.4(e).[16]

As in *Levy,* this court finds that the loan of custodial funds by Ellen Marshall to finance her husband's law practice pending receipt of accounts receivable from the dissolution of his former practice was for the "benefit" of their children. While there is a lack of documentation with respect to these loans, the money loaned has not been placed "beyond the reach" and benefit of the children. The continued existence of Mr. Marshall's practice is in the best interests of the children. Moreover, Mr. Marshall's law practice ap-

pears to be his sole means of income. He has both a legal duty and a moral duty to ensure that the funds are repaid to the proper custodial accounts. Moreover, this is not a case where the funds were used to finance a second business. This court concludes that the loans to Mr. Marshall, albeit improperly documented with respect to either a written agreement or payment of interest, were for the "benefit" of the donee children and were proper under New York's UGMA.

### b. *Loan to Louis Cutajar*

The Government contends that the two loans to Louis Cutajar were an improper use of the custodial funds and thus the IRS should be permitted to levy upon these funds. The court agrees with the Government to the extent that the IRS may levy upon account 305 for $10,481.94. This amount represents the total of the two loans made to Mr. Cutajar from Sabrina's custodial account.

Loans from a custodial account to an individual outside the family are subject to a high degree of scrutiny. There was no evidence that the loan "benefited" Sabrina Marshall in any way. The funds were placed out of her reach. Additionally, the loaning of these funds was not made by "seeking a reasonable income and the preservation of capital." N.Y. EPTL § 7–4.4(e). In fact, Ellen Marshall never provided documentation revealing why the loans were made, whether interest would be paid, when they would be repaid or how *Sabrina* would "benefit" from such an "investment." *See Heath,* 97 Ill.Dec. at 619, 493 N.E.2d at 101. While similar to the loans to the children's father with respect to a lack of written documentation, in the case of Mr. Marshall, there was a direct benefit to them and a moral obligation to repay the loan. No such obligation exists here. Thus, Louis Cutajar had neither a legal nor a moral obligation to repay the $10,481.94 to the custodial account.

Even if Ellen Marshall provided sufficient evidence that the whole loan was repaid and

---

**16.** *See Allen,* 301 So.2d at 418 (the court found evidence that a deposit of "money repaid to the father [, a guardian of the account,] on a loan previously made to his sister" did not invalidate the custodial nature of the funds when the proceeds of this account were eventually placed in an UGMA account).

that the principal and accompanying interest were deposited in Sabrina's custodial account, this would not be evidence that the loan was made for the "benefit" of Sabrina. The fact that Mr. Cutajar paid Ellen Marshall $7,000 and that the money was deposited into Sabrina's account is irrelevant to this court's inquiry regarding the propriety of the loan. The deposit is merely fortuitous for Sabrina since her bank account now contains $7,000 from funds that resulted from Ellen Marshall's personal dealings. In any event, Ellen Marshall has failed to establish that the $7,000 paid to her was in fact even a partial repayment of the two loans to Mr. Cutajar.

### c. *Certificate of Deposit 9319*

■ The Government has established that between January 9, 1985, the earliest record from The Bank of New York (*gov't ex.* B), and July 16, 1987, the date CD 9319 was liquidated and its proceeds were loaned to Mr. Marshall, (*gov't ex.* C), $8,395.68 has not been accounted for from the CD.

While the testimony of Ellen Marshall revealed that CD 9319 was opened with the money from SelmaLee Kaufman's initial $25,000 gift to Sabrina, the passbook for this CD, as of January 9, 1985, revealed *only* a balance of $21,090.01. Ellen Marshall testified that she did not know what became of the unaccounted for $3,909.99. (Tr. 103)

The Bank of New York records also reflect that between January 7, 1986 and May 29, 1986, there was $4,485.69 not accounted for from the custodial funds. (Tr. 57, 103–104); *Gov't Ex.* B at pp. 8–9. With respect to these funds, Ellen Marshall testified that she did not remember withdrawing such money from the CD nor did she know if anyone else withdrew that money. (Tr. 103)

■ The court is troubled by Ellen Marshall's inability to document how these custodial funds were used. Ellen Marshall's testimony simply is insufficient with respect to these funds to prove that the funds were used "for the benefit" of the children and not for personal use. Ellen Marshall as a custodian is charged with acting "as would a prudent [person] of discretion and intelligence who is seeking a reasonable income and the

preservation of capital." N.Y. EPTL § 7–4.4(e). Failure to account for $8,395.68 in custodial funds is not the act of a "prudent" person seeking the "preservation of capital." *See Buder,* 774 P.2d at 1390; *Levy,* 412 N.Y.S.2d at 290–292.

Plaintiff has failed to introduce any evidence with respect to the use of these custodial monies. Accordingly, this court finds that plaintiff Ellen Marshall violated her fiduciary duty by not accounting for this money and by placing them "beyond the reach" of the donees. Consequently, this court finds that plaintiffs cannot now be protected from the IRS's Levy with respect to the $8,395.68.

### d. *UGMA account 670*

■ As noted earlier, account # 670 was opened on January 17, 1989 (*Gov't ex.* R) with a cash deposit of $5,000. *Gov't Ex.* O. The representative from the Bank testified that this could have resulted from either (a) a "cash" deposit or (b) by the cashing of a Bank of New York check. (Tr. 57–58) This first option could not have taken place as all of SelmaLee Kaufman's gifts to her grandchildren were made by checks. (Tr. 121). With respect to the second option, the cashing of a Bank of New York check does not appear to have been possible since in January of 1989, SelmaLee Kaufman was using Irving Trust and not Bank of New York checks. *Gov't Ex.* L–3(a). According to the representative of the Bank of New York, an Irving Trust check could not be cashed at the Bank of New York. (Tr. 68). Furthermore, the January date for the opening of the CD is not consistent with SelmaLee Kaufman's gift giving practice which in almost every other case resulted in a check being delivered to her daughter in July.

Furthermore, following SelmaLee Kaufman's gift giving policy, it appears that Ms. Kaufman's 1989 gift to Grant was made in July through a $5,000 check, dated July 18, 1989 (# 182). *See Plt's Ex.* 1 at pp. 5–6; *Gov't Ex.* L–4. Thus, to be consistent with Ellen Marshall's testimony, SelmaLee Kaufman would have to have given Grant $10,000 in gifts in 1989. However, Ms. Kaufman never testified to this. Consequently, while account # 670 is a proper custodial account, this court finds that the initial deposit creat-

ing it was made without SelmaLee Kaufman's donative intent and can thus be levied upon by the IRS.

### e. *1991 Gifts to Sabrina and Grant*

■ As noted above, the records of the Bank of New York reflect that on July 18, 1991 a deposit of $5,000 was made into Sabrina's UGMA account number 305. *Gov't Ex.* Q at p. 9. This date corresponds to the date Ellen Marshall allegedly deposited $3,000 into that account.[17] Because the testimony and documentary evidence support a finding that $3,000 was given to Sabrina with donative intent by her grandmother and that bank entry on July 18, 1991 indicates a deposit, albeit for $5,000, this court will not permit the Government to levy on the $3,000 gift from SelmaLee Kaufman. The court is giving to plaintiffs the benefit of the doubt since it is too coincidental that $5,000 was deposited into the custodial account the same day check # 1131 was dated.

However, to the extent that there were no reasons given as to how or why the additional $2,000 was deposited into the custodial account on July 18, 1991, the court finds no donative intent with respect to this amount. Consequently, the Government can levy on account # 305 for $2,000.

■ The testimony also indicates that SelmaLee Kaufman gave to her daughter a check for $3,000 for Grant Marshall (check # 1142, dated July 31, 1991)[18]. However, the Bank of New York's records for UGMA account # 670 does not reveal a deposit of that check into the custodial account of Grant Marshall. *See Gov't Ex.* R at pp. 10–12. In fact, the back of check # 1142 (*see supra* in footnote 18) indicates a deposit into an account with the last two digits being "47". *Gov't Ex.* J–2 at p. 2. Neither of the UGMA accounts nor the custodial CD has an account number ending in "47." Thus, with respect to check # 1142, absent bank documentation, Ellen Marshall's testimony was insufficient to establish that this check was "delivered" by deposit into any of her children's custodial accounts.

### f. *November 24, 1986 cash deposit*

■ As noted above, on November 24, 1986, Ellen Marshall opened up CD 9629 with a $5,000 cash deposit. *Gov't Ex.* D and D–1. Ellen Marshall's testimony with respect to this CD is as follows: "Well, it's my testimony I don't remember depositing $5,000 in cash, unless I rolled something over and cashed it, and then deposited the cash." (Tr. 123). Ellen Marshall's testimony that this CD might have resulted from a previously rolled over CD is unsubstantiated. She never specified which CD this $5,000 came from. Moreover, such a *cash* deposit on a date not on or about Sabrina's birthday is inconsistent with SelmaLee Kaufman's gift

17. Plaintiff's exhibit one at page one is a photocopy of the front of a $3,000 check (# 1131) from SelmaLee Kaufman made payable to Sabrina Marshall, dated July 18, 1991. Page two of that exhibit is a photocopy of the supposed back of that check. A review of that back reveals a bank stamp indicating a date of July 26, 1990. That same check back is also on page four of plaintiff's exhibit one which supposedly corresponds to a $5,000 check made payable to Sabrina Marshall, dated July 25, 1990. Obviously, the check back on plaintiff's exhibit one at page two is not the back to check # 1131.

Government's exhibit J–1 at page one is also a photocopy of that same $3,000 check (# 1131) from SelmaLee Kaufman made payable to Sabrina Marshall, dated July 18, 1991. Page two of Government's exhibit J–1, which is claimed to be the proper back to check # 1131, notes a bank stamp with the date of July 18, 1991. This appears to be the proper back to check # 1131. However, this check back, contrary to all the other check backs identified in plaintiff's exhibit one, does not contain an endorsement which identifies the specific account into which the money was or should have been deposited.

18. Plaintiff's exhibit one at page one is a photocopy of the front of a $3,000 check (# 1142) from SelmaLee Kaufman made payable to Grant Marshall, dated July 31, 1991. Page two of that exhibit is a photocopy of the supposed back of that check. A review of that back reveals a bank stamp indicating a date of July 26, 1990. That same check back is also on page four of plaintiff's exhibit one which supposedly corresponds to the back of a $5,000 check made payable to Grant Marshall, dated July 25, 1990. Obviously, this check back is not the back to check # 1142.

Government's exhibit J–1 at page one is also a photocopy of that same $3,000 check (# 1142) from SelmaLee Kaufman made payable to Grant Marshall, dated July 31, 1991. Page two of government's exhibit J–1, which is claimed to be the proper back to check # 1142, notes a bank stamp with the date of August 10, 1991. This appears to be the proper back to check # 1142.

giving policy, if in fact this deposit was the result of cashing a check from SelmaLee Kaufman.

Further supporting this court's finding is the fact SelmaLee Kaufman had already given Ellen Marshall a $5,000 check for Sabrina on July 17, 1986 which was deposited in CD 9603. *Gov't Ex.* F. SelmaLee Kaufman did not testify that two gifts of $5,000 each had been given to Sabrina in 1986. Finally, the documentary evidence accounted for all gifts given to Sabrina up to that point in time: 1984—$25,000 gift (*plt's ex.* 1 at p. 5.); 1985—$5,000 gift (*plt's ex.* 1 at p. 7); and 1986—$5,000 gift (*gov't ex.* F). Consequently, the IRS may levy on the $5,000 amount derived from the November 24, 1986 deposit.

## CONCLUSION

This court weighed the varying interests of: (a) the owners of the funds—the children; (b) the IRS—the creditor—who is owed considerable amounts of money from liabilities incurred over ten years ago; (c) the custodian of the funds—a parent and delinquent taxpayer who is trying to shield the assets from dissipation; and (d) the other parent, the direct beneficiary of the loans—whose law practice required financing. The court, herein, has attempted to balance all these interests. The court is cognizant that for each dollar levied upon by the IRS the children will be penalized twofold: the first time having already occurred when the custodian of the accounts, their mother, improperly used the funds or could not account for them and the second time when the IRS levies to satisfy their parents' tax liabilities pursuant to the judgment to be entered hereon.

Based upon the foregoing, the court permanently enjoins the United States from enforcing its Notice of Levy on accounts 438–944670 and 438–945305 and CD 696–0152032 (*see Gov't Ex.* T–5) at the Bank of New York except to the extent of the declarations noted below. The court declares that: (1) Ellen Marshall is the custodian of account 438–944670 and 438–945305 and CD 696–0152032

at the Bank of New York; (2) the United States of America has a legal interest in (a) account 438–945305 for (i) $10,481.94 [Cutajar loan], (ii) for $2,000 [excess deposit of July 18, 1991 over $3,000 from check # 1131], (iii) for $5,000 [November 24, 1986 cash deposit into CD 9629], and (iv) for $8,395.68 ($3,909.99 plus $4,485.69 [both unaccounted for funds] )[19]; and (b) account 438–944670 for $3,000 [check # 1142] and $5,000 [January 17, 1989 cash deposit]; and (3) the Bank of New York has a duty to pay to the United States said amounts from the specified accounts.

Plaintiff's application for costs and attorney's fees pursuant to Fed.R.Civ.P. 11, 26 U.S.C. § 7430 and 28 U.S.C. § 1927 is denied.

SO ORDERED.

---

19. Since the money invested in CD 9319 was for the benefit of Sabrina Marshall and because the CD was liquidated on July 16, 1987 and its proceeds cannot be traced to any existing account, the Government's interest in $8,395.68 can be asserted against account 438–945305, the only existing account in the name of Sabrina Marshall at issue in the instant case.