JOHN R. BROWN, Circuit Judge:
 

 This is an appeal of a bankruptcy adversary case, wrongful tax levy claim, tried to the district court in a jumbled proceeding having some marks of each. The debtor-in-possession, Crismar Corporation (Crismar), instituted the adversary proceeding as a turnover action to regain $141,892.63 seized by the Internal Revenue Service (IRS) levy for payment of taxes of Mark C. Smith III, Taxpayer. The IRS seized the funds pursuant to a levy on the theory of alter ego status of Crismar and Taxpayer. The district court found that the Crismar bankruptcy estate is not entitled to the seized funds.
 

 On appeal, Crismar challenges the legal standard for, as well as the factual sufficiency of, the alter ego finding which established the nexus between the seized funds and Smith. More important, Crismar also maintains that the district court ignored both the Crismar bankruptcy estate, and basic principles of bankruptcy law because the matter was tried as a wrongful levy rather than a bankruptcy turnover action. We affirm in part, vacate in part, and remand.
 

 A Confused, Procedural Background
 

 On September 18,1987, the IRS levied on the assets of 33 companies controlled by Smith’s family (the “Smith family companies”), for Mark Smith’s unpaid taxes. Five days later, the Smith family companies sought a preliminary injunction in the district court claiming wrongful levy. The district court granted the injunction which never became effective for inability to post bond.
 

 On November 23, 1987, one of the Smith family companies, Crismar, filed for Chapter 11 bankruptcy protection. Crismar then filed a turnover action adversary proceeding under 11 U.S.C. § 542(a) in the bankruptcy court to recover the funds seized by the IRS, which would be a part of the bankruptcy estate as defined by 11 U.S.C. § 541(a). The bankruptcy automatic stay accomplished the same purpose as would have the preliminary injunction sought earlier. On December 15, 1987, the IRS under 28 U.S.C. § 157(d) moved in the district court to withdraw the reference to the bankruptcy court. After a rather complicated procedural history,
 
 [1]
 
 the case now before us was tried.
 

 Having withdrawn reference to the bankruptcy court so it was acting as a court in
 
 *109
 
 bankruptcy, the district court held the turnover adversary proceeding essentially to be in the nature of a wrongful levy action under 26 U.S.C. § 7426, and proceeded to try it under those elements. The district court found that the IRS established a nexus between Taxpayer (Smith) and the funds seized from Crismar by holding that Cris-mar was the alter ego of Smith. It then found that Crismar failed to meet its ultimate burden of showing the levy to be wrongful. Crismar appealed.
 

 Standard of Review
 

 In this bankruptcy matter, issues of law are reviewed de novo. We will not overturn findings of fact unless they are clearly erroneous.
 
 Matter of Killough,
 
 900 F.2d 61 (5th Cir.1990).
 

 Was the Wrongful Levy Right?
 

 Crismar’s appeal presents two major points. First, was the finding that Crismar was Smith’s alter ego either legally or factually erroneous, such that the nexus element of the wrongful levy action was not properly found? Second, in focusing on a wrongful levy approach, did the district court ignore the rights of the Crismar bankruptcy estate?
 

 Patterns Along the Wrongful Levy
 

 In order for Crismar to prove a wrongful levy, Crismar was required to show: 1) the IRS filed a levy covering taxpayer liability against property held by Crismar, 2) Crismar had an interest or lien on that property superior to the interest of the IRS, and 3) the levy was wrongful because Smith did not own the property, at least in part.
 
 Texas Commerce
 
 Bank—
 
 Fort Worth v. United States,
 
 896 F.2d 152, 156 (5th Cir.1990).
 

 To prove the levy was wrongful, Crismar was first required to make an initial showing of some interest in the funds, in order to have standing.
 
 [2]
 
 Once Crismar made the initial showing, the IRS was required to prove a nexus between the funds and Taxpayer. If the IRS proved a nexus by substantial evidence, Crismar then had the ultimate burden of proving the levy was wrongful.
 
 Morris v. United States,
 
 813 F.2d 343, 345 (11th Cir.1987);
 
 Valley Finance, Inc. v. United States,
 
 203 U.S.App.D.C. 128, 629 F.2d 162 (1980),
 
 cert. den. sub. nom., Pacific Dev., Inc. v. United States,
 
 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981).
 

 The district court concluded that the IRS established the nexus between the seized funds and Smith by finding that Crismar was the alter ego of Smith. Crismar attacks that finding on several fronts.
 

 First, Crismar, pointing to a list of factors which we previously developed to
 
 *110
 
 determine whether a subsidiary company is the alter ego of the parent in
 
 Jon-T Chemicals,
 

 [3]
 
 argues that the district court applied the wrong legal standard to find an alter ego. The district court should have used those factors to establish “total domination,” rather than the less rigorous standard of “active and substantial control.”
 

 We used the laundry list in
 
 Jon-T
 
 in lieu of verbally articulating a coherent doctrinal basis to find an alter ego.
 
 [4]
 

 Jon-T,
 
 768 F.2d at 691. We did so, at least in part, because, with no litmus test for determining whether a subsidiary is the alter ego of a parent, one must look to the totality of the circumstances in considering the factors.
 
 Id.
 
 at 694.
 

 The facts of this case do not concern a subsidiary and parent as in
 
 Jon-T,
 
 but the district court correctly gleaned the important factors from the
 
 Jon-T
 
 list to be considered in an alter ego question.
 
 [5]
 
 The district court applied an appropriate legal standard to the alter ego issue.
 

 Next, Crismar maintains that, if anything, it was “reverse piercing” of the corporate veil,
 
 [6]
 
 which Louisiana does not recognize.
 
 Owens & Sons, Inc. v. Gustella East, Inc.,
 
 354 So.2d 571 (La.App. 4th Cir. 1978),
 
 writ ref'd,
 
 356 So.2d 1013 (La.1978). However, no Louisiana cases, including
 
 Owens,
 
 squarely address the issue of reverse piercing concerning a seizure of the assets of an alter ego. The court in
 
 Owens
 
 did not embrace the reverse piercing remedy, finding it unnecessary because if the corporate assets are truly the assets of the individual rather than the corporation, the assets can be seized in execution of claims against the individual.
 
 Id.
 
 at 572. Thus, Louisiana law is no impediment to the district court’s findings in this case.
 

 Next, Crismar contends that the district court improperly found the nexus in the wrongful levy action because the alter ego finding was factually erroneous. The alter ego finding was erroneous because the district court (i) used the wrong legal standard, (ii) ignored the fact that Smith was not a shareholder of Crismar, and (iii) misinterpreted the evidence in finding that Smith controlled Crismar; the consequence being erroneous findings of fact.
 

 Again, the district court applied a proper legal standard. Not only did Cris-mar get the legal standard it pressed, but Smith’s ownership position was also one of the factors used and considered. We agree that the fact that Smith did not hold Cris-mar stock is a factor, but it does not pre-
 
 *111
 
 elude the finding of alter ego when control is otherwise established.
 
 Krivo Indus. Supply Co. v. Nat’l Distillers and Chem. Corp.,
 
 483 F.2d 1098, 1104 (5th Cir.1973).
 
 [7]
 

 We also reject Crismar’s assertion that the district court misinterpreted the evidence concerning control so that the finding of alter ego was not supported. To the contrary, the record is replete with valid support for the findings that Smith controlled Crismar and that Crismar was Smith’s alter ego.
 

 Taxpayer Smith was director and president or vice president of Crismar for all years but one. At all material times, Smith had the sole authority to write checks for Crismar. Crismar was owned by a series of single shareholders. Since 1970, those shareholders were always relatives, family members or Smith family companies.
 
 [8]
 

 The most recent owner” of Crismar was Smith’s son, who purchased Crismar in 1984 by an unsecured promissory note of $1000.00. A financial statement for Smith’s son dated December 31, 1987 revealed that Crismar
 
 [9]
 
 owned a substantial majority in sixteen Smith family companies and had assets of $2,095,536.95 with liabilities of $2,000.00. With one exception, those assets were acquired from the Smith family’s Assets Holding Corp., after the son’s purchase, in return for unsecured promissory notes. In contrast, Crismar’s bankruptcy petition, filed November 23, 1987, just sixty days before the financial statement, showed total assets of $456,-673.74.
 
 [10]
 

 Smith claimed to own no property.
 
 [11]
 
 Smith’s personal expenses were paid from Smith’s son’s checking account which was funded by “loans” from Crismar and from Smith’s son’s salary from Crismar and a wholly-owned subsidiary of Crismar. Even though the money came from Crismar and the subsidiary by way of Smith’s son,
 
 [12]
 
 it was Smith who instructed an employee working for Crismar and other Smith family companies as to which of his personal bills to pay, and when to pay them.
 

 From 1976 until 1987, the Smiths lived in a New Orleans garden district house, custom designed and built for Smith (the “So-niat residence”), but always owned by the Smith family companies. Smith referred to the Soniat residence as his “personal residence.” The Soniat residence was freely traded among the Smith family entities.
 
 [13]
 
 
 *112
 
 Crismar ended up with the Soniat residence. When it was sold to an outsider for $585,000.00, a check for $95,000.00 was given to Crismar at closing. Most of the funds seized by the IRS are traceable from the $95,000.00.
 
 [14]
 

 Given the well-supported conclusions of the district court, what we said eighteen years ago bears repeating in terms of these facts. One of the two ways for a corporation to be held liable for the debts of another entity is when it misuses the corporation by treating it, and by using it, as a mere business conduit for the purposes of the controlling entity. In such cases, “the courts will look through the forms to the realities of the relation between the companies as if the corporate agency did not exist and will deal with them as the justice of the case may require.”
 
 Krivo,
 
 483 F.2d at 1102-03 (1973) (quoting
 
 United States v. Reading Co.,
 
 253 U.S. 26, 63, 40 S.Ct. 425, 434, 64 L.Ed. 760 (1920)). In our case, the district court found, based upon the patterns of dealing among the Smith family companies, that they used the corporate form for illegitimate ends. They did so to enjoy the material benefits of the world without having to bear its tax burden.
 

 The findings of fact that Crismar was the alter ego of Smith were not clearly erroneous. Consequently, the IRS established a nexus. Crismar failed to prove that the levy against the Crismar entity was wrongful. Thus far, we sustain the findings and conclusions of the district court.
 

 Diving Into Whiting Pools
 

 Were this case not concerning interests in property claimed to belong to a bankruptcy debtor, we would stop here and affirm for the IRS. True, we previously pointed out that wrongful levy is the exclusive remedy for an innocent third party whose property was confiscated by the IRS to satisfy the tax debt of another.
 
 Texas Commerce,
 
 896 F.2d at 156. However,
 
 Texas Commerce
 
 did not involve an adverse claimant who was then a debtor under Bankruptcy Chapter 11. Crismar is a Chapter 11 debtor. However much the trial court redocketed, withdrew, consolidated, and severed, the district court could not escape the presence of a bankruptcy debtor or avoid the supremacy of the Bankruptcy Code. This amounts to no intrusion though since the district court withdrew the controversy from the bankruptcy court and was sitting in part, at least, as a judge in a bankruptcy proceeding.
 

 Crismar correctly contends, relying on
 
 United States v. Whiting Pools, Inc.,
 
 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), that the district court could not, but did ignore its bankruptcy status by nominally trying the case as a wrongful levy rather than as a turnover. Under
 
 Whiting Pools
 
 a turnover proceeding would be the appropriate remedy if Crismar had any bankruptcy interest in the property.
 
 [15]
 

 Even though the district court correctly found against Crismar in the wrongful levy phase, it failed to deal with
 
 Whiting Pools
 
 and the requirements of the Bankruptcy Code.
 
 Whiting Pools
 
 interprets 11 U.S.C. § 541(a)(1),
 
 [16]
 
 which reflects the broad range of interests in property intended by Congress to be included in the bankruptcy estate as property essential to a rehabilita
 
 *113
 
 tion effort.
 
 Whiting Pools,
 
 462 U.S. at 204, 103 S.Ct. at 2313.
 

 In
 
 Whiting Pools,
 
 the bankruptcy debtor filed for a turnover under 11 U.S.C. § 542(a) for the return to the estate of the debtor’s property which had been seized by the IRS immediately before the debtor filed bankruptcy. The Court affirmed the judgment in favor of the debtor because all the debtor’s interests in property must be included in the reorganization estate whether in the debtor’s possession or not. Provisions such as 11 U.S.C. § 542(a) facilitate the return of the debtor’s property in the possession or under the control of a secured creditor, even the IRS.
 
 Whiting Pools,
 
 462 U.S. at 203-205, 103 S.Ct. at 2312-14. However, the Court also said that the debtor’s interest in the property may be so minor as to be excluded from the estate.
 
 [17]
 

 Because the district court failed altogether either to (i) address the question of the bankruptcy estate’s interest in property to which the IRS has alter ego rights, (e.g.: to satisfy debts), because Crismar, the debtor, is the alter ego of Smith, or (ii) make a determination of the kind, nature, and value of the interest the Crismar estate might have had in the seized funds, the court’s findings and conclusions are significantly deficient. Consequently, we must vacate the district court’s judgment in complete favor of the IRS. The district court should have more precisely determined the nature of Crismar’s interest, if any, in the seized funds. In order for Crismar’s claim to prevail, the district court must find that Crismar showed that the estate had an interest in the seized funds as referred to in 11 U.S.C. § 541(a)(1), and as defined by the Supreme Court in
 
 Whiting Pools.
 

 [18]
 

 Although the matter is not before us, we would point out, without deciding that the levy was wrongful, the IRS potentially holds at least a secured interest if its tax lien was properly executed. If Crismar is found to have an interest sufficient to warrant a turnover and the IRS lien was properly executed, then the lien would not dissolve, nor would the IRS’s secured creditor status be destroyed. Furthermore, the IRS would be entitled to adequate protection of its interest.
 
 Whiting Pools,
 
 462 U.S. at 202, 211, 103 S.Ct. at 2312, 2316. Accordingly we remand for further inquiry consistent with this opinion.
 

 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 

 [1]
 

 .Procedural History Synopsis
 

 1. 9-18-87 Levy by the I.R.S. on Smith family companies for tax debts of Mark C. Smith III.
 

 2. 9-23-87 The Smith family companies file No. 87-4482,
 
 Century Hotels v. U.S.A.,
 
 in the Eastern District of La. for a preliminary injunction against the levy, alleging a wrongful levy (the initial wrongful levy suit). The district court grants the injunction, but the plaintiffs are unable to post a bond.
 

 3.11-23-87 Crismar files for bankruptcy protection under Chapter 11 of the Bankruptcy Code, No. 87-05176-B.
 

 
 *109
 
 4. 12-7-87 The district court stays and closes No. 87-4482, the initial wrongful levy suit (# 2 above), because of the automatic bankruptcy stay of 87-05176-B.
 

 5. 12-7-87 Crismar files an adversary proceeding in the bankruptcy court under No. 87-05176-B, seeking relief identical to that it and the other Smith family companies sought under No. 87-4482, the initial wrongful levy suit (#2 above).
 

 6. 12-15-87 The I.R.S., under 28 U.S.C. 157(d), moves to withdraw reference from the bankruptcy court of "Crismar’s adversary proceeding” (# 5 above). This motion was initially and erroneously filed under No. 87-4482 (# 2 above) which had been closed (# 4 above). However, the withdrawn proceeding became No. 88-707,
 
 Century Hotels v. U.S.A.,
 
 initially brought by Crismar as a turnover adversary proceeding.
 

 7. 2-24-88 The district court orders the withdrawal of "Crismar's adversary proceeding" filed in No. 87-05176-B (#5 above), and consolidates it with the action against the Smith family companies by the F.S.L.I.C., No. 87-5621-G, already before the court and which contained the same facts. Finally, the court orders the automatic bankruptcy stay lifted as it applied to the adversary proceeding concerning the I.R.S. seizure (i.e., this case, No. 88-707) only.
 

 8.8-8-89 The F.S.L.I.C. case (now referred to as No. 87-4078, an action to enforce judgment, on remand from the Fifth Circuit) was apparently indefinitely stalled. The district court severs this case, No. 88-707 (# 6 above), and proceeds to trial on the judgment presently under review.
 

 [2]
 

 . The district court found that the IRS conceded that Crismar met its initial burden of showing enough interest for standing.
 

 [3]
 

 .
 
 United States v. Jon-T Chemicals, Inc.,
 
 768 F.2d 686 (5th Cir.1985).
 

 [4]
 

 . Whether to apply Louisiana or federal law is not an issue. State and federal alter ego tests are essentially the same. Our non-diversity alter ego cases rarely state whether a state or federal standard controls, and apply state and federal cases interchangeably.
 
 Jon-T,
 
 768 F.2d at 690 n. 6.
 

 [5]
 

 . The district court did not indicate its findings as to each individual factor, but held that on these factors, Crismar was the alter ego of Taxpayer:
 

 1) Whether the taxpayer, Smith III, expended personal funds for the property;
 

 2) Whether Smith III enjoyed the benefit of the disputed property;
 

 3) Whether a close family relationship existed between Smith III and the titleholder of the disputed property, Crismar;
 

 4) Whether Smith III exercised dominion and control over the disputed property;
 

 5) Whether the record titleholder of the disputed property, Crismar, interfered with Smith Ill’s use of the property;
 

 6) Smith Ill’s ownership of Crismar;
 

 7) Whether Crismar observed corporate formalities;
 

 8) Whether Crismar maintains bank accounts, books and records;
 

 9) Whether Crismar and Smith III commingled funds;
 

 10) Crismar capitalization;
 

 11) Whether Smith III transferred assets, property, or funds to Crismar or vice versa;
 

 12) Whether Crismar was organized by Smith III;
 

 13) Whether Crismar had a distinct business with its own employees;
 

 14) Whether Crismar transacts Smith Ill’s business; and
 

 15) Whether Crismar pays Smith Ill’s personal obligations.
 

 [6]
 

 .Reverse piercing occurs when assets of the corporate entity are used to satisfy the debts of the controlling alter ego. 1 W. Fletcher,
 
 Cyclopedia of the Law of Private Corporations
 
 § 41.70 at 706-09 (rev. perm. ed. 1990).
 

 [7]
 

 .
 
 Accord Baker v. Raymond Int'l, Inc.,
 
 656 F.2d 173, 181 (5th Cir.1981).
 

 [8]
 

 . Crismar was one of 33 corporations levied on by the IRS as nominees or alter egos of Smith and his wife. Smith was officer or director of most. Smith was signatory for all corporations where he was an officer. Until 1984, Assets Holding Corp., a Smith real estate development company, owned virtually all of the stock of the Smith family companies. Assets Holding Corp. was in turn owned by First Family Investors Trust. Smith was the sole trustee of First Family and his children the beneficiaries.
 

 [9]
 

 . Crismar’s 1983 tax return showed matching assets and liabilities of $108,622.00.
 

 [10]
 

 . The District Court was not given a satisfactory explanation for the discrepancy between the net value shown in the financial statement and that shown in the bankruptcy petition. Crismar’s brief attempts to explain the discrepancy by pointing out that the bankruptcy petition also showed $467,673.74 in liabilities. With that information, as we see it, there was an even bigger discrepancy.
 

 [11]
 

 . Smith’s financial statement, filed with the IRS in June, 1987, indicated he had no cash, stocks, car, income, and expenses. In 1988, Smith, individually, filed a Chapter 7 bankruptcy petition. In the petition, Smith indicated he had no income from any source, and owned no property except his clothes and wristwatch. Ms. Smith said in her deposition that after a failed business in 1968, Smith elected to shunt all his income to his children. This was done to avoid creditors and an involuntary bankruptcy. It was at this time that First Family Investors Trust was created.
 
 See supra
 
 note 8.
 

 [12]
 

 . Crismar's brief styles the payments as "gifts." There was no evidence showing whether the "loans’’ were repaid. However, the district court concluded that the “loans" were not loans and would never be repaid.
 

 [13]
 

 . At some point, Assets Holding Corp. became the owner. Smith's son and Assets Holding Corp. owned the furniture. In 1985, Assets Holding Trust acquired the house from Assets Holding Corp. The acquisition was pursuant to a tripartite marketing agreement among Assets Holding Corp., Assets Holding Trust, and Cris-mar. Smith signed the document on behalf of all three, his wife notarized it, and Smith’s son witnessed it. In 1987, Assets Holding Trust conveyed the Soniat residence to Crismar. None of
 
 *112
 
 these transactions contained the normal Mortgage and Conveyance Certificate or the Certificate of Tax Research to indicate that the various transfers were conducted as general real estate transactions made in the normal course of business.
 

 [14]
 

 . What happened to the other $490,000.00 was not revealed.
 

 [15]
 

 . To be sure, to state that on applicable wrongful levy principles the IRS could levy on Cris-mar to enforce tax liability of Taxpayer Smith, on one hand, and then imply that liability of Crismar’s property is different in a turnover proceeding is, at the least, a paradox.
 

 [16]
 

 .Section 541(a)(1) provides:
 

 (a) The commencement of a case under ... this title creates an estate. Such estate is comprised of all the following property, wherever located:
 

 (1) Except as provided in [other sections], all legal or equitable interests of the debtor in property as of the commencement of the case.
 

 [17]
 

 . The Supreme Court said:
 

 8. Section 541(a)(1) speaks in terms of the debtor's "interests ... in property,” rather than the property in which the debtor has an interest, but this choice of language was not meant to limit the expansive scope of the section. The legislative history indicates that Congress intended to exclude from the estate property of others in which the debtor had some minor interest such as a lien or bare legal title. See 124 Cong Rec 32399, 32417 (1978) (remarks of Rep. Edwards); id., at 33999, 34016-34017 (remarks of Sen. De Con-cici); cf. § 541(d) (property in which debtor holds legal but not equitable title, such as a mortgage in which the debtor retained legal title to service or to supervise servicing of mortgage, becomes part of estate only to extent of legal title); 124 Cong Rec 33999 (1978) (remarks of Sen. DeConcini) (§ 541(d) “reiterates the general principal that where the debtor holds bare legal title without any equitable interest, ... the estate acquires bare legal title without any equitable interest in the property"). Similar statements to the effect that § 541(a)(1) does not expand the rights of the debtor in the hands of the estate were made in the context of describing the principle that the estate succeeds to no more or greater causes of action against third parties than those held by the debtor. See HR Rep No. 95-595, pp 367-368 (1977). These statements do not limit the ability of the trustee to regain possession of property in which the debtor had equitable as well as legal title.
 

 Whiting Pools,
 
 462 U.S. at 204 n. 8, 103 S.Ct. at 2313 n. 8.
 

 [18]
 

 .
 
 See
 
 n. 17.