HILDY BOWBEER, United States Magistrate Judge
North Country Escape, LLC ("North Country") brought this quiet title action against the United States of America pursuant to 28 U.S.C. § 2410. (Compl. ¶¶ 1, 2 [Doc. No. 1].) The Internal Revenue Service ("IRS") issued a Notice of Federal Tax Lien to North Country as the nominee of Gary W. Haider and Jacquelyn J. Haider (collectively "the Haiders"). (Compl. Ex. A [Doc. No. 1-1].) North Country disputes that it is a nominee of the Haiders and seeks the removal of the lien. (Id. ¶¶ 6, 7, Prayer for Relief.) The United States contends the Notice of Federal Tax Lien is lawful under one of two theories: either the property was fraudulently conveyed to North Country, or North Country was acting as the taxpayers' alter ego. (Am. Answer ¶ 7 [Doc. No. 48]; Def. Proposed Conclusions of Law [Doc. No. 53].)
By the consent of the parties, the case was tried to the Court on May 3, 2017. After a transcript was prepared and filed [Doc. No. 52], the parties filed proposed findings of fact and conclusions of law [Doc. Nos. 53, 54]. The matter was taken under advisement at that time. Based on the testimony and exhibits offered at trial, and the oral and written submissions of counsel, the Court makes the following findings of fact and conclusions of law. See Fed. R. Civ. P. 52(a)(1).
I. FINDINGS OF FACT
A. The Subject Property
1. The Haiders purchased a condominium unit located at 2845 29th Avenue, Unit 904, Township of Cedar Lake, Wisconsin 54817 ("Subject Property") on December 16, 2005, for $550,000. (Tr. 111:25-112:4 [Doc. No. 52]; Def. Ex. 5.)
2. The Subject Property is legally described as:
Unit 904, Building 900, of Fairways at Tagalong Motel, a Condominium, together with said unit's undivided appurtenant interest in the common elements and the exclusive use of the limited common elements appurtenant to said unit, all in Fairways at Tagalong Motel, a *1029 Condominium declared and existing under and by virtue of the Condominium Ownership Act of the State of Wisconsin, and recorded by Declaration as such condominium in the Office of the Register of Deeds for Barron County, Wisconsin, on April 25, 2003, in Records 1040-336, as Document No. 673771, as first amended in Records 1051-390, as Document No. 676232; as second amended in Document No. 698964, said condominium being located in the Township of Cedar Lake, Barron County, Wisconsin, on the real estate described in said Declaration and amendment and incorporated herein by this reference thereto.
(Def. Ex. 6).
3. The Subject Property is one of four 900-series condominium units at the Fairways at Tagalong ("Tagalong"). (Tr. 89:1-9.) The 900-series units are the largest condominium units at Tagalong and are similar in size. (Tr. 89:17-23, 90:4-6.)
4. Tagalong is adjacent to a golf course and Red Cedar Lake. (Tr. 76:25-77:5, 90:9-13.)
5. The Haiders began to permanently reside at the Subject Property in 2015, after the mortgage on their principal residence was foreclosed. (Tr. 118:25-119:1.)
B. The Tax Assessments and Notice of Federal Tax Lien to the Haiders
6. The Haiders failed to timely file federal income tax returns for tax years 2005 through 2010. (Tr. 106:25-107:3.)
7. On July 27, 2009, and August 30, 2010, the IRS assessed income tax, interest, and penalties against the Haiders for tax years 2005, 2006, and 2007. (Def. Ex. 1.)
8. On June 29, 2011, the IRS filed a Notice of Federal Tax Lien against the Haiders for their unpaid federal income tax liabilities for tax years 2005, 2006, and 2007. (Def. Ex. 1.) The Notice advised the Haiders of the lien and their right to a hearing under IRC 6320. (Def. Ex. 1.)
9. As of June 29, 2011, the unpaid balance of the assessments for tax years 2005, 2006, and 2007 was $144,129.27. (Def. Ex. 1.)
10. The IRS gave notice of the Notice of Federal Tax Lien to the Haiders on June 30, 2011. (Def. Ex. 1; Tr. 108:4-7.)
11. On September 15, 2015, the IRS issued a Notice of Federal Tax Lien to the Haiders that included the previous assessments for tax years 2005, 2006, and 2007, and added new assessments for tax years 2008, 2009, and 2010, which increased the total balance of unpaid assessments to $249,067.94. (Def. Ex. 3.)
12. The Haiders were not able to pay their federal income tax liabilities. (Tr. 113:20-114:7.) Gary Haider testified that in 2011 he and his wife were "going broke." (Tr. 106:5-7.)
C. North Country and Thomas Lockner
13. North Country is a Minnesota limited liability company, whose only member is Thomas Lockner. (Tr. 154:6-11.)
14. Lockner graduated from the University of Minnesota Law School in 1994 and is admitted to practice law in the State of Minnesota. (Tr. 170:17-25.)
15. Lockner works primarily in the area of transactional business law, but a small portion of his practice is dedicated to preparing tax returns and handling tax matters for his clients, including representing clients before the IRS. (Tr. 140:5-1.)
16. In 2008, Lockner began buying and selling distressed properties. (Tr. 172:20-24.) In 2008-2010, he spent about twenty to twenty-five percent of his time buying and selling distressed properties, and his *1030 business has escalated since then. (Tr. 173:20-25, 174:1-4.)
17. Lockner met Gary Haider in early 2011 through a mutual acquaintance who knew about Lockner's side business and about Gary Haider's distressed financial situation. (Tr. 174:12-24.)
18. In the fall of 2012, Lockner prepared and filed Gary Haider's federal income tax return for tax year 2011. (Tr. 191:24-192:2.) Lockner subsequently prepared Gary Haider's 2012 and 2013 returns. (Tr. 192:3-4.)
19. Gary Haider told Lockner in 2011 that the Haiders had financial problems and an outstanding tax debt. (Tr. 106:8-15, 141:4-17.)
20. Lockner established North Country in July 2011, for the purpose of acquiring the Subject Property. (Tr. 154:6-14; Pl. Ex. 4.)
21. Before the transfer, Lockner did not have the Subject Property appraised or inspected, nor did he conduct a title search. (Tr. 143:14-19, 144:12-13, 145:3-5.)
D. The Sale of the Subject Property to North Country
22. On July 15, 2011, North Country entered into a written contract with the Haiders to purchase the Subject Property for $250,000. (Def. Ex. 4.)
23. The purchase price was later reduced to $225,000. (Def. Ex. 9; Tr. 120:16-19.)
24. North Country and the Haiders executed a warranty deed transferring the Subject Property to North Country. (Def. Ex. 6.) The warranty deed was recorded with the Barron County Recorder on July 26, 2011. (Def. Ex. 6.)
25. The Haiders had not offered the Subject Property for sale to anyone else, and there is no evidence they had the Subject Property appraised before they sold it to North Country. (Tr. 130:16-18.)
26. North Country and the Haiders entered into an oral agreement by which North Country would pay the monthly mortgage payments for the Subject Property after the transfer, but there was no written agreement to that effect and North Country did not assume the mortgage. (Tr. 149:15-25, 150:1-7, 188:10-20.) The original note and mortgage remained in the Haiders' name. (Tr. 149:23-150:2.) North Country began making the mortgage payments after the transfer (Tr. 121:2-4); however, it ceased making mortgage payments in August 2016 for "loss mitigation purposes" (Tr. 160:7-12).
27. Gary Haider testified he has never directly received any amount from the purchase price. (Tr. 112:8-14, 147:18-22.)
28. Gary Haider testified there was no agreement between North Country and the Haiders for North Country to pay the Haiders' creditors as part of the consideration for the transaction. (Tr. 112:15-18.)
29. Lockner testified he paid "a combination of parties to meet [his] consideration obligation," pursuant to the parties' agreement that he would pay the Haiders' creditors. (Tr. 147:23-25, 148:1-11.)
30. The schedule of consideration maintained by Lockner reflects a purchase price of $225,000, comprising an encumbrance of $181,000, and direct and indirect payments to Gary Haider or the Haiders' creditors over a twelve-month period in the amount of $44,000. (Tr. 188:3-189:16; Pl. Ex. 5.) The direct and indirect payments include payments to CenturyLink; Xcel; S & K TV Systems; Mikana Marine & Resort LLC; Lethert, Skwira, Schultz & Co. LLP; Quality Propane; Fairways at Tagalong Condominium; Central Loan Administration; Barron County Treasurer; State Farm Insurance; and Gary Haider. (Pl. Ex. 5.)
*1031 31. On the same date as the Subject Property transaction, the Haiders and North Country executed a separate Use and Purchase Option Agreement. (Def. Ex. 7.)
32. The Use and Purchase Option Agreement gave the Haiders the option to repurchase the Subject Property from North Country at any time within two years of the transfer. (Def. Ex. 7.)
33. Under the Use and Purchase Option Agreement, the Haiders were responsible for paying all ownership expenses related to the Subject Property, including association dues, licenses, real estate taxes, insurance premiums, mortgage payments, and debt service expenses. (Def. Ex. 7, ¶ 2; Tr. 113:9-11.)
34. The Use and Purchase Option Agreement granted the Haiders full use and enjoyment of the Subject Property. (Def. Ex. 7.)
35. The Use and Purchase Option Agreement was not recorded. (Tr. 158:6-8.)
36. At some point after the sale of the Subject Property, the Haiders stopped paying the ownership expenses. (Tr. 113:12-19.) Lockner paid those expenses until the parties entered a lease in 2015. (Tr. 179:10-17.)
37. The Haiders did not exercise the option to repurchase the property within the two-year period. (Tr. 117:17-19.)
38. On July 15, 2011, Gary Haider conveyed title to a boat to North Country in exchange for $12,000. (Tr. 114:14-17; Def. Ex. 25.) The Haiders had purchased the boat in 2004 for $30,000. (Tr. 114:18-21.)
E. The Value of the Subject Property
39. One of the factors germane to the United States' fraudulent conveyance theory is whether "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." Minn. Stat. § 513.44(b)(8) (1987) (amended 2015). Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred is a question of fact. See In re Northgate Computer Sys., Inc. , 240 B.R. 328, 362, 365 (Bankr. D. Minn. 1999). "The inquiry on this element is fundamentally one of common sense, measured against market reality." Id. at 365.
40. Gary Haider testified that at the time of the transaction, he believed the value of the Subject Property was "possibly ... $300,000." (Tr. 130:19-22.) His belief was based on a poor real estate market, construction defects at the Tagalong resort, problems with the golf course and restaurant, and the possibility that Tagalong would fail as a resort. (Tr. 132:19-25, 133:1-9, 133:16-25, 134:1, 134:23-25, 135:1-12.) Gary Haider recalled that several repossessed condominium units had sold at auction for less than $100,000. (Tr. 134:4-7.)
41. Lockner testified that at the time of the transaction, he believed $225,000 was a fair price for the Subject Property. (Tr. 150:10-13.)
42. After the transaction, Tagalong was involved in litigation concerning construction defects related to several condominium units, but the defects did not concern the Subject Property. (Tr. 133:6-9, 196:13-19.) There was no evidence that there were any construction defects in the Subject Property or other units in the 900 series.
43. According to Barron County records, the estimated fair market value of the Subject Property in 2011 was $481,100; the "assessment ratio" was 1.1521; and the total assessed value of the Subject Property *1032 in 2011 was $554,300. (Def. Exs. 10, 12.)[1]
44. Property assessor Randy Prochnow is an independent contractor who performs property assessments for Cedar Lake Township in Wisconsin. (Tr. 46:6-12.) He is licensed by the State of Wisconsin. (Tr. 46:17-18.)
45. In his capacity as a property assessor for Cedar Lake Township, Prochnow had determined the estimated market value and the total assessed value of the Subject Property in 2011 that was reflected in Exhibits 10 and 12. (Tr. 46:25, 47:1-4, 53:22-25.)
46. There were two 900-series Tagalong condominium units sold in 2011. (Tr. 57:8-12.) One was the Subject Property, Unit 904, which was sold on July 22, 2011, for $225,000. The other was Unit 902, which was sold on August 22, 2011, for $491,000. (Tr. 86:6-15, 90:14-21; Def. Ex. 21.)[2] Unit 902 was in the same building as Unit 904 and was similar to Unit 904 in square footage, though it differed slightly in layout. (Tr. 89:17-23.)
47. Prochnow did not use the July 22, 2011, sale of the Subject Property in arriving at the estimated fair market value of the Subject Property because the sale price was only fifty percent of the prior assessed value of that unit, and the sale price of the similar unit in the same building was within ten percent of the assessed value. Therefore, he concluded, the sale of the Subject Property was outside normal parameters. (Tr. 70:11-17.) Prochnow concluded that $225,000 did not represent the fair market value of the Subject Property in 2011. (Tr. 71:1-3.)
48. Prochnow also did not use in his valuation of the Subject Property the recent sales of twelve "apartment-style" Tagalong condominium units, which had been sold for about $200,000 apiece, because they were about one-third the size of the Subject Property. (Tr. 58:18-25, 59:1-5.)
49. North Country objected at trial to Prochnow's testimony about his valuation of the Subject Property on two grounds. (See Pl. Mem. at 2-4 [Doc. No. 41]; Tr. 24:5-26:24; 56:23-57:2.) It objected that Prochnow's testimony was expert opinion, and the United States had not disclosed him as an expert under Federal Rule of Civil Procedure 26(a)(2).[3] It also objected that valuations for property tax assessment *1033 purposes are not relevant to fair market value. The Court held its decision on the objection to Prochnow's testimony in abeyance. The Court now sustains in part and overrules in part the objection.
50. North Country objected that Prochnow's testimony about his valuation of the Subject Property was expert opinion under Federal Rule of Evidence 702 that the United States had failed to disclose in accordance with the requirements of Federal Rule of Civil Procedure 26(a)(2). It cites SunTrust Mortgage, Inc. v. Busby , No. 2:09CV03, 2010 WL 3945103, at *8 (W.D.N.C. Oct. 6, 2010), for the proposition that testimony about the value of property must come from a qualified expert witness. The United States, relying on Burlington Northern Railroad Co. v. Nebraska , 802 F.2d 994, 1005 (8th Cir. 1986), responds that Prochnow's opinion on the value of the Subject Property was lay opinion rationally based on his personal observations of the Subject Property and other Tagalong condominiums, his review of records prepared in the ordinary course of business, and his perceptions based on industry experience, not on scientific, technical or other specialized knowledge within the scope of Federal Rule of Evidence 702.
The Court deferred its ruling on this objection, but now concludes that Prochnow's testimony expressing his opinion about the fair market value of the Subject Property was not simply that of a layperson testifying about conclusions anyone could have drawn from personal observation of the property and a review of records, but rather that of someone who was relying at least in part on his "specialized knowledge" and training. Neither Burlington Northern nor Warner Bros. Entertainment, Inc. v. X One X Productions , 644 F.3d 584, 592 (8th Cir. 2011), also cited by the United States, involve the admissibility of opinions from an appraiser about the value of property.[4] By contrast, while the issue in SunTrust was not whether such a witness must be disclosed in accordance with Federal Rule of Civil Procedure 26(a)(2), the court necessarily concluded that opinions on property valuation constituted expert testimony when it excluded the proffered testimony by a county tax assessor on the ground that "the Defendants never qualified him as an expert witness." SunTrust , 2010 WL 3945103, at *8.
Here, Prochnow may well have been qualified to offer an expert opinion, but it is undisputed that he was never disclosed as an expert as required by Rule 26(a)(2).[5] Accordingly, the Court excludes *1034 Prochnow's testimony to the extent he offered an opinion on the fair market value of the Subject Property on the ground that the United States failed to timely disclose him as an expert witness.
On the other hand, the Court may consider the facts to which Prochnow testified from his personal knowledge about the basis for the estimated fair market value of the Subject Property stated in Defendant Exhibits 10 and 12. And while North Country further objected that Prochnow's testimony was not relevant,[6] it did not object to, or seek to limit the Court's consideration of, Defendant Exhibits 10 and 12, which reflected the conclusion Prochnow had reached in 2011 about the estimated fair market of the Subject Property.
Accordingly, the Court finds Prochnow's fact testimony about what he considered in arriving at the estimated fair market value for the Subject Property to be relevant and will consider it in determining how much weight to give Defendant Exhibits 10 and 12. Cf. In re Gray, 2010 WL 276179, at *3 (noting the value of additional information about the basis for the proffered real estate tax assessments in determining the weight to be afforded them).
F. The Lease Agreement
51. North Country and the Haiders did not have a formal lease agreement when the Haiders moved into the Subject Property in 2015. (Tr. 152:23-25.) They entered into a formal agreement in February 2016, which was backdated to November 1, 2015. (Tr. 153:1-3; Def. Ex. 8.)
52. Under the rental agreement, the Haiders were obligated to pay North Country $2,000 a month for rent and to pay for all utilities. (Def. Ex. 8.)
53. The Haiders did not make timely rent payments to North Country after they first moved into the Subject Property. (Tr. 154:22-155:8.)
54. The Haiders have timely paid their monthly rent for "all but two months since 2015." (Tr. 179:21.)
G. Property Taxes
55. North Country paid $5,970.29 in property taxes for the Subject Property in 2011. (Def. Ex. 12.)
56. North Country did not object to the 2011 assessed value of $554,300 for the Subject Property. (Tr. 151:9-11.)
H. The Notice of Federal Tax Lien Issued to North Country
57. A Notice of Federal Tax Lien dated September 15, 2015, was issued to North Country as the nominee of Gary W. Haider. (Compl. Ex. A.) The notice listed unpaid assessments for tax years 2005-2010, which totaled $249,067.94. (Id. ) The lien was placed on property identified as:
*1035 Parcel ID: 010-4127-14-000; Section: 11, Town: 36N, Range: 10W, Qtr. Qtr. Section: NW, Qtr. Section: NE, Unit 904, Building 900, of Fairways at Tagalong Motel, a Condominium, together with said unit[ ]s undivided appurtenant interest in the common elements and the exclusive use of the limited common elements appurtenant to said unit, all in Fairways at Tagalong Motel, a Condominium declared and existing under and by virtue of the Condominium Ownership Act of the State of Wisconsin, and recorded by Declaration as such condominium in the Office of the Register of Deeds for Barron County, Wisconsin, on April 25, 2013, in Records 1040-336, as Document No. 673771, as first amended in Records 1051-390, as Document No. 676232; as second amended in Document No. 698964, said condominium being located in the Township of Cedar Lake, Barron County, Wisconsin, on the real estate described in said Declaration and amendment and incorporated herein by this reference thereto. Address: Unit 904 at 2855 29th Avenue, Birchwood WI 54817.
(Id. ) A similar notice was issued to North Country as the nominee to Jacquelyn J. Haider listing unpaid assessments for tax years 2005, 2006, 2007, 2008, 2009, and 2010, which totaled $231,468.16. (Id. )
I. Recent Events
58. As of May 12, 2016, the outstanding principal on the mortgage for the Subject Property was $157,280.96. (Def. Ex. 11.) Gary Haider is named as the account holder on the statement. (Def. Ex. 11.)
59. As of May 3, 2017, North Country had not made a mortgage payment since August 2016 for "loss mitigation" purposes. (Tr. 160:7-12.)
60. Assuming a regular monthly mortgage payment of $906.09 (Pl. Ex. 5), North Country would have paid approximately $54,365 from September 2011 to August 2016.
61. As of May 3, 2017, the note and mortgage associated with the Subject Property were in default and facing foreclosure proceedings, despite North Country's financial ability to pay the mortgage payments. (Tr. 155:12-14, 159:6-8.)
62. As of May 3, 2017, the Haiders continued to reside at the Subject Property and continued to pay $2000 a month in rent. (Tr. 160:13-24.)
63. As of May 3, 2017, the Haiders had not been made aware of the foreclosure proceedings. (Tr. 130:3-5.)
J. Reasonably Equivalent Value
64. The Court finds that the value of the consideration received by the Haiders was approximately $98,365, which represented the $44,000 paid to Gary Haider and his creditors and the approximately $54,365 paid on the mortgage. Although Lockner testified North Country promised to make the mortgage payments, North Country did not assume the mortgage obligation; there was no written agreement memorializing its promise to make the mortgage payments; it ceased making the mortgage payments after August 2016 and as a result the Subject Property is in foreclosure; and there is no evidence the Haiders have attempted to enforce the purported obligation since that time or intend to in the future. Accordingly, the Court finds that the remaining balance of the mortgage loan should not be included as a part of the consideration for the transfer of the Subject Property.
65. The Court finds that the value of the asset transferred is no less than $300,000 and no more than $481,100, although *1036 the Court finds it more likely than not that the value was closer to $481,100. Gary Haider believed the Subject Property to be worth "possibly" $300,000; however, he had no personal knowledge of comparable properties, including units for sale or sold at Tagalong; there is no evidence that he had the Subject Property appraised before he sold it; and he did not seek out other possible purchasers. In addition, although several condominium units may have had construction defects, those defects did not concern the Subject Property or units comparable to the Subject Property, and Gary Haider had no reason to believe that they did. By contrast, the fair market value as set forth in Defendant Exhibits 10 and 12, which were admitted without objection and the basis for which was explained by Prochnow, was $481,100. Moreover, one comparable 900-series Tagalong condominium unit sold in August 2011 for $491,000.
66. In any event, under either of these valuations, the value of the consideration received by the Haiders was not reasonably equivalent to the value of the asset transferred.
II. CREDIBILITY FINDINGS
1. The Court finds not credible Gary Haider's testimony that he never directly received any amount of the purchase price, in light of Lockner's testimony to the contrary and the schedule of consideration maintained by Lockner.
2. The Court finds not credible Gary Haider's testimony that there was no agreement between North Country and the Haiders for North Country to pay the Haiders' creditors as part of the consideration for the transaction, in light of Lockner's testimony to the contrary and the schedule of consideration maintained by Lockner.
3. The Court finds not credible Lockner's testimony that at the time of the transaction he believed $225,000 was a fair price for the Subject Property. Lockner had no personal knowledge of comparable properties, including units for sale or sold at Tagalong; he did not have the Subject Property appraised before he purchased it; he did not object to the 2011 Barron County valuation for the Subject Property; and he offered no other basis for his belief about the fair market value of the property.
III. CONCLUSIONS OF LAW
1. The IRS Certificates of Assessments, Payments, and Other Specified Matters establish the validity of the federal tax assessments against the Haiders. See United States v. Gerads , 999 F.2d 1255, 1256 (8th Cir. 1993).
2. A person or entity may bring an action against the United States to quiet title to real or personal property on which the United States has a lien. 28 U.S.C. § 2410(a)(1).
A. North Country Has an Interest in the Subject Property
3. The plaintiff has the initial burden to show an interest in the Subject Property. See Xemas, Inc. v. United States , 689 F.Supp. 917, 922 (D. Minn. 1988) ; Century Hotels v. United States , 952 F.2d 107, 109 (5th Cir. 1992).
4. The United States does not dispute that North Country has an interest in the Subject Property, and the Court so concludes.
B. The United States Has Shown that the Haiders Have an Interest in the Subject Property
5. After the entity bringing the action establishes an interest in the property, the burden shifts to the United States to show that a delinquent taxpayer has an interest in the real or personal *1037 property. See Xemas , 689 F.Supp. at 922 ; Century Hotels , 952 F.2d at 109.
6. A taxpayer's property interest is determined under state law. United States v. Craft , 535 U.S. 274, 278, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002).
7. Here, the IRS seeks to establish the Haiders' interest in the Subject Property through a fraudulent conveyance theory, as codified in the Minnesota Fraudulent Transfer Act ("MFTA"), Minn. Stat. § 513.44. The IRS may satisfy the tax liability of a taxpayer by attaching a federal tax lien to property that the taxpayer fraudulently transferred to another. See United States v. Scherping , 187 F.3d 796, 805-06 (8th Cir.1999) ; United States v. Johnson , Civ. No. 05-3017 (RLE), 2007 WL 1695740, at *5 (D. Minn. Mar. 30, 2007).
8. The MFTA was amended effective August 1, 2015. On the date of the transfer of the Subject Property, the MFTA provided:
(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.
Minn. Stat. § 513.44(a) (1987)(amended 2015).
9. The United States contends the sale of the Subject Property was made with an actual intent to hinder, delay, or defraud the IRS. In determining whether the Haiders acted with such intent, the Court may consider (but is not limited to considering) the following factors:
(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.
Minn. Stat. § 513.44(b).
*1038 10. Five § 513.44(b) factors weigh strongly in favor of concluding that the Haiders sold the Subject Property to North Country with an actual intent to hinder, delay, or defraud the IRS:
a. The Haiders retained possession and control of the Subject Property after the transfer. See Minn. Stat. § 513.44(b)(2). They continued to use the property as they had before the transfer, and they were responsible for paying all ownership expenses related to the Subject Property. The parties did not enter into a lease agreement until 2015, when the Haiders began to reside permanently at the Subject Property.
b. The Notice of Federal Tax Lien filed on June 29, 2011, was analogous to filing suit or threatening to file suit. See Minn. Stat. § 513.44(b)(4). The IRS filed a Notice of Federal Tax Lien against the Haiders for their unpaid federal income tax liabilities for tax years 2005, 2006, and 2007, in the amount of $144,129.27. The Notice advised the Haiders of the lien and their right to a hearing under IRC 6320. Though the IRS did not sue or threaten suit, the filing of the Notice was sufficiently analogous to conclude this factor weighs in favor of finding an intent to hinder, delay, or defraud the IRS.
c. The value of the consideration received by the Haiders was not reasonably equivalent to the value of the asset transferred. See Minn. Stat. § 513.44(b)(8). The value of consideration received was $98,365, whereas the value of the Subject Property was between $300,000 and $481,100.
d. The Haiders were insolvent before the sale of the Subject Property. See Minn. Stat. § 513.44(b)(9). They were not able to pay their federal income tax debt and were, in Gary Haider's words, "going broke."
e. The transfer occurred shortly after a substantial debt was incurred. See Minn. Stat. § 513.44(b)(10). Though the IRS began assessing income tax, interest and penalties on July 27, 2010, the Notice of Federal Tax Lien was filed on June 29, 2011, approximately two weeks before the transfer of the Subject Property.
11. Four § 513.44(b) factors weigh slightly against concluding that the Haiders sold the Subject Property to North Country with an actual intent to hinder, delay, or defraud the IRS.
a. The transfer was not to an insider. See Minn. Stat. § 513.44(b)(1). Though Gary Haider and Lockner met through a mutual acquaintance, their relationship was purely professional in nature, and Lockner did not begin preparing the Haiders' tax returns until the fall of 2012.
b. The transfer was disclosed. See Minn. Stat. § 513.44(b)(3). The warranty deed transferring the Subject Property to North Country was recorded with the Barron County Recorder on July 26, 2011.
c. The Haiders did not abscond. See Minn. Stat. § 513.44(b)(6). They continued to live in their primary residence and used the Subject Property as they previously had.
d. The Haiders did not remove or conceal assets. See Minn. Stat. § 513.44(b)(7). Again, the only evidence is that they continued to use the Subject Property as they previously had.
12. Two § 513.44(b) factors are neutral or inapplicable.
*1039 a. Though Gary Haider told Lockner in 2011 that the Haiders had financial problems and an outstanding tax debt, the United States submitted no evidence about the Haiders' actual assets on which the Court can base a conclusion that the Subject Property represented substantially all of the Haiders' assets.
b. There is no evidence that the Haiders transferred the Subject Property to a lienor who then transferred the assets to an alter ego or other insider of the Haiders.
13. Other relevant, non-statutory factors also weigh in favor of finding that the Haiders acted with actual intent to hinder, delay, or defraud the IRS.
a. Gary Haider conveyed a boat title to North Country in exchange for $12,000 on the same day the Subject Property was sold. This act precluded the IRS from seizing the boat to satisfy some of the tax debt, and there is no evidence the Haiders applied the proceeds toward the debt.
b. The Haiders did not list the Subject Property for sale on the open market or offer it privately to any other person or entity.
c. Shortly after the Haiders and North Country executed the Use and Purchase Agreement, the Haiders stopped paying the ownership expenses, but North Country did not take any adverse action against the Haiders for violating the agreement.
14. On balance, the Court concludes that the Haiders transferred the Subject Property to North Country with actual intent to hinder, delay, or defraud the IRS. The United States has therefore met its burden to show that the Haiders have an interest in the Subject Property.
C. The Lien Is Valid
15. After the United States demonstrates that the Haiders have an interest in the Subject Property, North Country has the ultimate burden to prove the lien was wrongful. See Scoville v. United States , 250 F.3d 1198, 1201-02 (8th Cir. 2001).
16. North Country concedes that if the United States meets its burden to establish a nexus between the Haiders and the Subject Property, the lien is not otherwise invalid. The Court agrees and concludes the lien is valid.
D. The United States' Alternate Arguments
17. Because the Court has determined that the lien is valid under a fraudulent conveyance theory, the Court need not reach the United States' alternate theories of constructive fraudulent conveyance or alter ego.
Accordingly, based on the foregoing and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that Plaintiff North Country Escape LLC's Complaint [Doc. No. 1] is DISMISSED WITH PREJUDICE .
LET JUDGMENT BE ENTERED ACCORDINGLY .

Although North Country indicated in a pretrial memorandum that it would oppose the introduction of property tax assessment records [see Doc. No. 41], the Court instructed counsel to make his objections as specific exhibits were offered (Tr. 37:23-38:6). North Country did not object to the admission of Defendant Exhibits 10 or 12. (Tr. 73:6-17.)

North Country objected at trial to Defendant Exhibit 21 as containing inadmissible hearsay in the form of the appraised value of Unit 902, and the Court sustained the objection to that portion of the exhibit but admitted it for all other purposes. (Tr. 96:12-97:15.) However, purchaser Roccy Raymond testified at trial to the purchase price and other sales information concerning Unit 902, without objection, and the Court relies on this testimony as independent evidence of the purchase price and fair market value of Unit 902.

Federal Rule of Civil Procedure 26(a)(2) provides that a party must disclose the identity of any witness it may use at trial to present expert testimony, along with, inter alia, a statement of all opinions the witness will express, the basis and reasons for those opinions, the facts considered by the witness in forming those opinions, the witness's qualifications, and a list of all cases in which the witness has testified as an expert in the previous four years. These disclosures must be made at least ninety days before the date set for trial unless the court orders otherwise. Fed. R. Civ. P. 26(a)(2)(D). Because the parties' Rule 26(f) report states that "[n]either party anticipates any expert witnesses" [Doc. No. 13 at 3], the Pretrial Scheduling Order did not establish a separate deadline for expert disclosures.

The question in Burlington Northern was whether railroad executives could offer lay opinion testimony on whether trains with cabooses were safer than cabooseless trains based on their personal knowledge and perceptions gained from years of experience in the railroad industry. 802 F.2d at 1004-05. The issue in Warner Bros . was whether an attorney who had not been disclosed as an expert could testify about how the documents relating to a copyrighted work showed the chain of title. 644 F.3d at 592.

The United States also argues that any failure to comply with the formal requirements of Rule 26(a)(2) did not prejudice North Country because the United States took Prochnow's deposition during fact discovery and all of his opinions regarding valuation were discussed during that deposition. North Country's counsel chose not to attend that deposition and apparently did not read it until the United States' trial brief signaled its intention to introduce Prochnow's opinions at trial. (Tr. 31:9-15, 32:2-8.) The Court agrees that it would have been far preferable if North Country's counsel had either attended the deposition or read the transcript promptly thereafter, and then timely raised this issue through a motion in limine. Ultimately, however, his failure to do so was engendered by the United States' representation in the parties' Rule 26(f) report and the subsequent failure to provide formal notice either in advance of that deposition or, at the latest, ninety days before trial.

The Court acknowledges the considerable authority in support of North Country's position that "the assessed value of property for tax purposes, in and of itself, is generally not admissible as direct evidence of value for purposes other than taxation." EOP-Nicollet Mall, L.L.C. v. Hennepin Cty. , 723 N.W.2d 270, 283 (Minn. 2006) ; see also United States v. Certain Parcels of Land, 261 F.2d 287, 289-90 (4th Cir. 1958) (collecting cases and secondary authorities); In re McCarron , 242 B.R. 479, 482 (Bankr. W.D. Mo. 2000). But even if a valuation done for tax assessment purposes is not determinative of fair market value, a court may consider it as some evidence of value. See, e.g., United States v. Johnson , No. 05-cv-3017(RLE), 2007 WL 1695740, at *2, *9, & n.1 (D. Minn. Mar. 30, 2007) (considering an assessor's estimated market value in determining pursuant to Minn. Stat. § 513.44(b) whether a transfer was made for reasonably equivalent value); In re Gray , No. 09-14004-RGM, 2010 WL 276179, at *3 (Bankr. E.D. Va. Jan. 15, 2010).